Vincent AMATO, Plaintiff,

v.

UNITED STATES of America; Federal Bureau of Investigation; Donald E. Alman; Ralph L. Frank; Glenn Woodeshick; Louis Giovanetti; and Fourteen Unknown Federal Bureau of Investigation Agents, Defendants.

Civ. A. No. 80–1255.

United States District Court, D. New Jersey.

Oct. 27, 1982.

Brownstein, Gold, Booth & Barry by Joyce C. Booth, and Howard Brownstein, Jersey City, N.J., for plaintiff.

W. Hunt Dumont, U.S. Atty. by Judy Sello, and Bette Uhrmacher, Asst. U.S. Attys., Newark, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

This is an action under the Federal Tort Claims Act for damages sustained by the plaintiff as the result of his being severely injured by gunfire during a bank robbery in which he was one of the principal participants. Plaintiff alleges that the Federal Bureau of Investigation ("FBI") was negligent in that it did not apprehend him earlier for a lesser crime and that it utilized unreasonable and excessive force in apprehending him at the scene of the bank robbery.

It is very tempting in the face of such a claim to dismiss it summarily on the ground that an armed bank robber should not be permitted to complain of injuries sustained by him, since it is he who put the forces in motion which ultimately resulted in his own injury. But fortunately we live in a country where law enforcement offi-cers are not permitted to act as judge, jury and executioner. They may not use unreasonable or unnecessary force, no matter how serious the offense committed. It is this restriction which differentiates a democracy from a totalitarian state. Although the shooting of a bank robber may not inflame the passions as would that of a teenager in the commission of a minor crime, the same principles of law apply to each. Therefore, although recognizing that it is not a concept which will be met with public acclaim, even a person in the active commission of a crime has certain rights. Such person is not to be subjected to unreasonable, unnecessary or excessive force. Law enforcement officers, on the other hand, are entitled to use such force as is reasonable and necessary under the surrounding circumstances in order to protect themselves and the public and to apprehend the criminal. With those general principles in mind, the court will deal with the facts of this particular case.

The plaintiff, Vincent Amato and two other persons, John Calarco and Frank Vuono, planned to rob the Wood-Ridge National Bank in Wood-Ridge, New Jersey. They sought the assistance of a well-known merchant in stolen cars, who, in turn, reported the plot to the FBI. From that moment on the FBI knew as much about the plans as the robbers themselves. In fact, rather than permit the informant to go out and actually steal a getaway car, the FBI furnished it.

In the days leading up to the robbery, the plaintiff and his accomplices were under surveillance and were actually photographed "casing" the bank. Although the getaway car was equipped with a tape recorder and a transmitter, it was of no value to the FBI in the planning stages, because the robbers did not intend to use the getaway car until the day of the actual robbery. Furthermore, the informant refused to wear any secret recording device on his body and only agreed to cooperate upon the condition that his identity would not be revealed and he would not be required to testify.

This placed the FBI in a dilemma. After conferences with the United States Attorney, they determined that they had sufficient evidence to support only a very weak conspiracy charge and several minor charges against the plaintiff and his colleagues; and therefore they determined to permit the plaintiff and his accomplices to proceed to the point of entry into the bank—to complete the crime of attempted bank robbery.

The court finds specifically in respect to the assertion that the government was negligent in not arresting plaintiff sooner and for a lesser crime that such contention is totally without merit.

■ Firstly, although law enforcement agents have a duty to maintain law and order, how best to fulfill that duty is within the discretion of the officers. *Redmond v. United States,* 518 F.2d 811, 816–17 (7th Cir. 1975); *United States v. Faneca,* 332 F.2d 872, 875 (5th Cir. 1964), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965). Decisions such as whether, when and how to prosecute a person are generally considered to be discretionary with the agency. *Blessing v. United States,* 447 F.Supp. 1160, 1179 n. 28 (E.D.Pa.1978); *Bernitsky v. United States,* 620 F.2d 948, 955 (3d Cir.) *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980), (decisions of Mine Enforcement and Safety Administration officers as to investigation and enforcement are discretionary.) As such, these decisions fall within the discretionary function to the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1965), which exempts from the Tort Claims Act:

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Blessing v. United States,* 447 F.Supp. at 1179 n. 28; *United States v. Faneca,* 332 F.2d at 875; *Smith v. United States,* 375 F.2d 243, 248 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967).

■ To determine whether decisions fall within the discretionary function exception, courts in this circuit apply a planning-operation distinction. The discretionary exception includes decisions made at the planning level, but not those made at the operational level. *Mahler v. United States,* 306 F.2d 713, 723 (3d Cir.), *cert. denied,* 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962). The basis for the distinction is that planning level decisions generally involve policy considerations. *Id.* Applying this distinction to the facts of this case, the court finds that the decision of when to arrest the perpetrators and the determination of the plan of arrest to be used are discretionary functions within the meaning of § 2680(a). These decisions occurred at the planning level and involved issues of law enforcement policy.[1] Because these decisions have been excepted from the scope of the Federal Tort Claims Act, the doctrine of sovereign immunity operates to deprive this court of jurisdiction over the subject matter of these claims. *Gibson v. United States,* 457 F.2d 1391, 1392 n. 1 (3d Cir. 1972).

■ Even if the court had subject matter jurisdiction over these claims, it finds no abuse of discretion on the part of the defendant. Section 21 of the F.B.I. Manual of Instruction contains some guidelines to be

---

1. The FBI determined that without the testimony of the informant, there was little or no evidence to support a charge of conspiracy. That evidence, if any, could be supplied by the recording devices placed in the getaway car, but that would necessitate a determination of whether there was sufficient evidence while the robbers were already en route to the bank. The FBI determined that the arrest could be effectuated without any danger to the public or the bank employees outside of the bank itself. Arrest for the lesser crimes was rejected because of the paucity of evidence and because the FBI sought to obtain a conviction against the plaintiff which carried a substantial potential penalty because of his extensive criminal record and the danger to society which he presented.

followed by agents in determining when to interrupt a bank robbery. In particular, paragraph 2 provides:

Prime consideration must be given to the safety of innocent bystanders as well as all individuals involved. In this regard, every effort should be made as early as possible to determine when a conspiracy has been committed. Information received and facts developed through investigation should be referred to the USA for his opinion as to whether a conspiracy prosecution may be undertaken. It is more desirable to prevent a robbery, burglary, or larceny by arrest for conspiracy than to endanger the lives of financial institution personnel and other innocent bystanders. Plans for such an operation should include apprehension before the contemplated violators enter the financial institution.

The testimony at trial indicated that these guidelines were followed in this case, and all proper factors were considered.

■ In addition, the court finds that there is no duty which runs to the criminal in such a situation. Plaintiff, in effect, states to the FBI that you should have stopped me, and because you did not, I was injured and you are responsible. If that contention were carried to its logical extreme, the government would be liable to a burglar who fell off a ladder during the course of a burglary, if the police had the basis to arrest him earlier and did not.

Furthermore, it is not the failure to arrest the plaintiff which is the cause of his injuries, but his own intentional and intervening act of going to the bank for the purpose of robbing it which precipitated his injuries, and not the failure of the FBI to arrest him.[2]

If a private citizen were injured as the result of the FBI failing to act at an earlier and different time and place, those circumstances *might* give rise to a cause of action by the injured bystander. But the bank robber himself can make no such claim.

The only valid basis upon which the government may be held liable is if the plaintiff has proved by a preponderance of the evidence that the FBI used unreasonable or excessive force in arresting him, which issue brings us to the day of the robbery, November 19, 1976.

Having determined to permit the robbers to commit the crime of attempted bank robbery, the FBI developed a plan and put in place a small army of agents. Aerial photographs had been taken of the shopping center. Aside from the driveway entrances and exits, the center was enclosed by a cyclone fence. Once the robbers entered the car, their conversation was monitored via the transmitter. An FBI airplane overhead observed their movements. Five agents were inside the bank to secure the safety of bank employees and customers. They were to remain in the teller positions so as to create the impression of business as usual. A female agent seated at a desk, upon command was to close the interior entrance to the bank electronically so as to permit the robbers to enter the outer set of doors, enter the vestibule, but not gain access to the bank itself.

The arrest team with four agents was hidden in a camper parked directly opposite the entrance to the bank. Upon command they were to exit the camper and effectuate the arrest of the robbers. A van was stationed to the side of the bank and next to a Grand Union supermarket. It was to block off any attempted escape and serve as back-up for the arrest team. It contained three agents.

Agents were also stationed on the top of the bank and on the roof of the Grand Union. On command they were to use a bullhorn to identify themselves as FBI and distract the robbers from the approaching arrest team. A command post was established in a church directly opposite the bank, but outside of the shopping center. Numerous other vehicles and agents were outside of the shopping center in the unlike-

---

2. Under plaintiff's theory, if he was struck by an automobile the day the FBI could have arrested him, the government would be liable because if they had acted promptly, he would not have been on the street and therefore would not have been injured.

ly event an escape beyond the shopping center was attempted. All of the agents in the immediate area of the bank were armed with shotguns except for those in the bank who had handguns only. Shotguns were used in the hope that such a show of fire and manpower would dissuade any attempt at resistance or escape.

The FBI watched and listened as the car made several passes at the bank while the occupants discussed possible problems or detection. Finally, they decided that the moment was right and parked directly in front of the bank. As soon as the plaintiff and John Calarco exited the vehicle, the FBI moved into action. Plaintiff rushed up to the bank and entered the first set of doors only to find the inner doors locked. He also observed law enforcement officers in the bank whom he believed to be FBI agents with drawn guns. He turned to flee and raced out of the bank.

At the precise moment plaintiff and Calarco exited the automobile, agents in the camper began their exit. The first agent was observed by Frank Vuono from the driver's seat in the getaway car. He yelled: "Get back in there * * * * " and fired a shot from his .38 weapon and threatened to fire again. This first shot by Vuono was equivalent to the splitting of an atom. It was the catalyst for the chain reaction which followed. Plaintiff denies that the first shot was fired by Vuono, but the court specifically finds that it was.

The agents who had been in the camper opened fire. They not only struck Vuono and the plaintiff as he fled from the bank but three agents in the bank.[3] Those agents thinking they had been fired upon by the robbers immediately commenced firing their handguns. Those agents who were on the roofs and in the van, some of whom saw Vuono shoot, heard handguns fired from the front of the bank, saw an injured agent, saw and heard the other agents firing their weapons and saw the

plaintiff run and dive into the car with a weapon, joined in the firing. From the moment plaintiff jumped from his car until the last shot was fired, thirty-three seconds had elapsed. In that short period of time, eleven agents had used their weapons a total of thirty-nine times and had fired a total of 281 bullets and buckshot pellets. Frank Vuono was dead. Plaintiff had received sixty-five wounds. Four agents had been wounded. The automobile had been hit approximately 141 times.

Two factual assertions by plaintiff of his actions during this Armageddon require specific attention. Plaintiff contends that his pistol never left his rear waistband and that he raised his hands in a gesture of surrender in front of the bank and shouted, "O.K. O.K.," only to be hit repeatedly, requiring him to seek shelter in the car.

The court accepts plaintiff's contention that he never fired his automatic, because such conclusion is supported by the scientific and physical evidence or the lack of it. The court, however, rejects his contention that he never carried or displayed the weapon. Plaintiff testified that he did not take out his weapon upon leaving the car for fear that it would be observed. The court finds that contention incredible, because plaintiff had placed a pantyhose mask over his head and put on green rubber gloves before leaving the car. To suggest that these would not attract attention but a weapon would is to ignore reality. Furthermore, several agents at different vantage points observed plaintiff with gun in hand. Finally, when plaintiff was removed from the vehicle the gun was found nestled in the left front of his sweat shirt and not in his rear waistband.

As to his claim of purported surrender, the evidence does not support his testimony. Plaintiff testified that when he was a few feet from the getaway car he attempted to surrender. Plaintiff's version was tailored so as to coincide with a tape of the incident

**3.** To place the camper in the direct line of the bank entrance with the robbers and getaway car in between obviously was not a stroke of battlefield genius. However, if there was any

negligence in the positioning of the agents, there was no breach of any duty to the plaintiff in connection therewith.

that he had obtained under the Freedom of Information Act. On that tape, indeed the plaintiff is heard to say "O.K. O.K." However, what plaintiff did not know was that the tape recorder (as opposed to the transmitter) was only activated by plaintiff's presence in the car on the passenger seat. Therefore, since those words appear on that tape recording, by necessity they must have been spoken by plaintiff while inside the vehicle, rather than outside as he contends.

Even if plaintiff's version were true, which it is not, the actions of his co-conspirator cannot be ignored. The court began this opinion with recognition of the principle that even a criminal in the course of committing a crime has certain rights. If he surrenders upon command, does not resist, and makes no attempt to flee, he cannot and should not be physically harmed, no matter how serious the crime just committed may be. It is at this moment that the wheels of justice must begin to turn and be permitted to run their course.

However, a person acting in concert with others may have forfeited his right to effectuate such a surrender. One's co-conspirator is one's agent. If that person has used deadly force against police officers and they are reasonably in fear that he will continue to do so, the one inclined to surrender may not be able to dissolve his association where his partner, in close proximity, appears to have plans to carry on the battle. Having determined to enter into an illegal enterprise, the plaintiff may have deprived himself of the right and ability to disassociate himself from the venture under such circumstances. In other words, if the FBI had the right to shoot at Mr. Vuono, plaintiff cannot complain that he was hit because he was nearby, despite his unilateral desire to surrender.

▇▇▇ From these facts Mr. Amato contends that the actions taken by the FBI to implement the plan for his arrest were negligent. The theory of negligence advanced is that the officers used excessive and un-

reasonable force to make the arrests. Under the Federal Tort Claims Act, New Jersey law controls on the issue of use of force by the officers.[4] New Jersey law limits the amount of force that may be utilized by law enforcement officers to that amount which reasonably appears to be necessary to effectuate arrests. *State v. Williams,* 29 N.J. 27, 39, 148 A.2d 22 (1959). The determination of whether or not excessive force was used in any situation is to be made on the basis of the facts as they reasonably appear to the officer at the time of the occurrence. *Id.* The tort law of negligence imposes a duty to act reasonably under the circumstances, and when an emergency condition exists, a police officer's conduct is measured against the demands of the emergency.

> "The rule of law in determining negligence in this type of situation is that when one is confronted with an emergency, with no time for thought, or to weigh alternative courses of action, but must make a speedy decision based on impulse and instinct gained from experience, the finder of fact, using the reasonable man test, may absolve him from liability even if a wiser course might have been selected if time permitted due deliberation be given to the matter."

*Viruet v. Sylvester,* 131 N.J.Super. 599, 602, 331 A.2d 286 (App.Div.), *cert. denied,* 68 N.J. 138, 343 A.2d 426 (1975), (where police officer left his vehicle to approach decedent in his car, and the officer observed the vehicle proceed forward as if to run him over, the application of the emergency doctrine required the conclusion that the officer was not negligent when he fired shots at the oncoming vehicle that killed the decedent). Where an offender offers physical resistance to arrest, a law enforcement officer need not retreat, but may become the aggressor and use such force as is necessary to overcome the resistance and to protect himself from serious injury. *State v. Williams,* 29 N.J. at 39, 148 A.2d 22; *Wimberly v. Paterson,* 75 N.J.Super. 584, 594, 183 A.2d

---

**4.** The use of force by law enforcement officers in New Jersey is now governed by statute; N.J.Stat.Ann. § 2C:3–7 (West Supp.1982).

This statute was enacted after the events giving rise to this lawsuit occurred, so it is not applicable to this case.

691 (App.Div.), *cert. denied,* 38 N.J. 340 (1962). Even when law enforcement officers are legally justified in firing their weapons, they are held to a duty of extraordinary care in the use of their firearms when the shooting causes harm to innocent bystanders. *Davis v. Hellwig,* 21 N.J. 412, 416, 122 A.2d 496 (1956). Under New Jersey law there is a presumption that a police officer acted with ordinary caution and in good faith in the performance of his duties. *State v. Williams,* 29 N.J. at 44–45, 148 A.2d 22.

 Here, the FBI had a duty to arrest plaintiff and his co-conspirators, who were committing an attempted armed bank robbery. Plaintiff's burden is to demonstrate that the officers used excessive and unreasonable force to effectuate the arrests. In essence, plaintiff charges that too many agents fired too many shots for too long a period of time. Initially the court finds that there was no negligence on the part of the FBI in having too many agents on the scene. On the contrary, the more agents the greater the show of force, the more likely that there will be no resistance.

As to the number of shots fired, it is not appropriate in the court's view to place emphasis on the total number of shots fired, although it is more dramatic to do so. Under such circumstances, the agents do not have the luxury of holding a conference to allocate responsibility and decide who will respond and who will not. The action must be viewed from the eyes of each agent individually and not collectively. Each fired his weapon in the sincere and reasonable belief that either the agent himself or one of his colleagues was in mortal danger. No single agent fired without reasonable cause and none fired an excessive number of times considering all of the surrounding circumstances.

In evaluating the actions of the FBI at the scene, it is important to consider what information they possessed regarding the plaintiff and his accomplices. Plaintiff had a long criminal record of armed robberies. He was currently being investigated for numerous unsolved robberies. He was known to use firearms for said robberies and was capable of violence. He associated with other known, violent criminals, one of whom was his partner in crime in this venture, Frank Vuono. Plaintiff's *modus operandi* was to use a mask and gloves, and he followed that practice in preparation for this robbery.

Furthermore, the FBI knew the robbers had weapons and actually heard them being loaded by way of the transmission. They also listened in as the robbers donned their gloves and masks (pantyhose).

Even FBI agents are to be judged by a standard of reasonableness and not perfection. In retrospect, far too many shots were fired than were necessary, but hindsight is not the standard by which these matters are to be judged. In the same respect, the firing may have continued longer than necessary. At some point, Mr. Vuono was dead and plaintiff incapacitated. But those facts were not readily apparent at the time, and it is impossible to determine when in that thirty-second period of time the agents were justified in concluding that no further danger existed. Even when the firing ceased the agents approached the vehicle with great caution, because they still were not certain that the danger had ended.

Viewing all of the facts and circumstances of the emergency created by the actions of the plaintiff and his co-conspirators, the court finds that the agents acted reasonably to cause the arrests of the robbers and to protect themselves and their colleagues from bodily injury. Because the agents acted reasonably, defendant has no liability for plaintiff's injuries.

 The government contends that even if the FBI were found to be negligent, that plaintiff is barred by his own contributory negligence from any recovery. Under New Jersey law, contributory negligence of the plaintiff will bar recovery in a negligence action if the contributory negligence was greater than the negligence of the defendant. N.J.Stat.Ann. § 2A:15–5.1. Because the plaintiff has proven no negligence of the defendant it is unnecessary to reach

a determination of contributory negligence. Furthermore, to discuss plaintiff's conduct in terms of negligence standards may tend to confuse rather than clarify what is in issue. Plaintiff's conduct was not negligent in the traditional sense. He entered into a conspiracy to commit an intentional criminal act. His accomplice fired the first shot which set the forces of destruction in motion. Plaintiff bears responsibility for those acts. Return fire was foreseeable. Confusion was foreseeable. Injury and death were foreseeable.

Each individual agent who was placed in fear of bodily harm or who reasonably believed that he or his colleagues were in such danger had the right to respond with equal force. Having gone to a bank with the intention of robbing it, armed with loaded weapons, and firing such weapon at an FBI agent, the plaintiff is responsible for the foreseeable consequences. It is foreseeable that: he who lives by the gun shall die by the gun.

There is a line over which a law enforcement officer may not cross. That line must be drawn on a case by case basis depending on all of the surrounding circumstances as viewed by a reasonable officer at the time and place involved. However, one must also recognize the risks of this profession and the brief time allotted to evaluate such risk and respond to it. We must not permit or encourage the use of force unless it is reasonable and necessary. On the other hand, we should not condemn the use of force when it is essential to protect the law enforcement officer or the public.

The fact that such a claim could be heard in the courts of our society is a recognition of the great value we place on the rights of the individual, no matter how anti-social his behavior has been. The rejection of his claim is not a rejection of the right to assert such claims under appropriate circumstances, but merely a finding that those circumstances do not exist in this case.

With the increasing incidence of crime in our society, we must constantly remind law enforcement officers to act with restraint, particularly in the face of the mounting frustration they must encounter in combating crime. We must also recognize their invaluable and frequent heroic contribution to our society and not hold them liable for the acts done in the proper performance of their duties.

For the foregoing reasons, judgment shall be entered in favor of the defendant and against the plaintiff. Counsel for the defendant shall submit an appropriate form of order in accordance with this opinion.