**Marilyn FLAX, Administratrix Ad Prosequendum of the Estate of Irving Flax, and Marilyn Flax, Individually, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 91–2807.

United States District Court,
D. New Jersey.

Jan. 12, 1994.

Pamela B. Keitz, Cuccio & Cuccio, Hackensack, NJ, for plaintiffs.

Anthony J. LaBruna, Sp. Asst. U.S. Atty., Newark, NJ, for defendant.

### OPINION

CHESLER, United States Magistrate Judge.

## I. *INTRODUCTION*

This matter comes before the Court on the motion of defendant, the United States of America, to dismiss the above-captioned action for lack of subject matter jurisdiction or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56. In accordance with the provisions of § 636(c) of Title 28 of the United States Code, the parties consented to have this motion tried before the undersigned and, by Order dated December 20, 1991, all proceedings with regard to this matter were referred to the undersigned for disposition.

After plaintiff filed her complaint and defendant filed its answer, defendant moved for dismissal or, in the alternative, for summary judgment. This Court found that plaintiff's claims against the Federal Bureau of Investigation ("FBI") fell within the discretionary function exception to the Federal Torts Claims Act,[1] and granted defendant's motion for summary judgment. *See Flax v. U.S.,* 791 F.Supp. 1035 (D.N.J.1992). Plaintiff then appealed the decision to the United States Court of Appeals for the Third Circuit. The Third Circuit determined that plaintiff was entitled to further discovery of the FBI's rules and regulations before the Court could find that defendant had a right to summary judgment as a matter of law. Accordingly, the Court of Appeals vacated this Court's Order and remanded the action for further proceedings consistent with its opinion 983 F.2d 1050.

After plaintiff completed her examination of the FBI's regulations, defendant renewed its motion for dismissal or, alternatively, for summary judgment. Oral argument was reheard on October 12, 1993.

## II. *BACKGROUND*

### A. Facts

The facts significant to the resolution of this motion are not in dispute, and have been set forth in both this Court's earlier opinion and again in the opinion issued by the Third Circuit. On the morning of January 23, 1989, at approximately 9:30 a.m., Irving Flax, plaintiff's deceased ("decedent"), left his

---

1. The Federal Tort Claims Act is codified at 28 U.S.C. § 2671; the discretionary function exception is codified at 28 U.S.C. § 2680(a).

home intending to go to work. Affidavit of Marilyn Flax ("Flax Aff.") at ¶ 2. Before he could enter his vehicle, the decedent was abducted by John Martini Sr. and his accomplice, Theresa Afdahl. Complaint, First Count at ¶ 1. Later that morning, at approximately 10:30 a.m., plaintiff Marilyn Flax received a telephone call from Martini. Flax Aff. at ¶ 3. Martini informed plaintiff that he had kidnapped the decedent and demanded $100,000 for his release. *Id.*

Plaintiff then contacted the Fair Lawn Police Department. *Id.* at ¶ 7. The Fair Lawn Police Department, in turn, contacted the Bergen County Prosecutor's Office and the Federal Bureau of Investigation ("FBI"). *Id.* at ¶ 8.

Plaintiff received a second call from Martini at approximately 11:30 a.m. *Id.* at ¶ 9. Martini asked plaintiff if she had obtained the ransom money. *Id.* When plaintiff advised Martini that she could not obtain the entire $100,000 ransom, Martini asked if she could raise $25,000. *Id.* Martini told plaintiff that he would telephone again later that day to see whether plaintiff had raised $25,000. *Id.*

At approximately 2:30 p.m. that afternoon, FBI special agents arrived in Fair Lawn and assumed command of the kidnapping investigation and surveillance. *Id.* at ¶ 10. The agents installed a tap on plaintiff's phone, although it was of no avail when Martini subsequently contacted plaintiff.

At approximately 5:00 p.m., Martini telephoned plaintiff a third time and asked plaintiff if she had secured the ransom money. *Id.* at ¶ 14. Plaintiff advised Martini that she had raised the $25,000. *Id.* Martini then instructed plaintiff regarding when and where plaintiff was to leave the money. *Id.* After plaintiff withdrew the ransom money from a bank, the FBI recorded the serial numbers and arranged for plaintiff to drop off the money in accordance with Martini's instructions.

At approximately 7:30 p.m. that evening, plaintiff proceeded to the designated location, a local diner, to make the ransom payment. *Id.* at ¶ 18. Upon observing Martini, plaintiff deposited the ransom money and drove off. *Id.* Because at this point the agents had not yet ascertained the location of Irving Flax, and suspected that another kidnapper was involved, they did not immediately apprehend Martini. Instead, the agents observed the kidnapper and attempted to follow him until they could determine the location of Irving Flax. At some point, however, the agents lost track of Martini. After unsuccessfully searching for him in New York and New Jersey, the agents terminated the search.

The decedent's body was discovered on the morning of January 24, 1989. *Id.* at ¶ 19. The decedent had been shot to death. *Id.* On January 25, 1989, Martini and Afdahl were apprehended. They were charged with, and subsequently convicted of, the kidnapping and murder of decedent. Complaint, First Count at ¶ 22.

### B. Procedural History

On or about March 27, 1990, plaintiff, on behalf of herself individually and as administratrix of the decedent's estate, filed an administrative tort claim against defendant through its agency, the FBI. Complaint, Exhibit B. Plaintiff's claim sought damages under the Federal Tort Claims Act, 28 U.S.C. § 1346(b),[2] in the amount of $15,000,000.00. *Id.* On January 23, 1991, the United States Department of Justice denied the administrative claim. Complaint, Exhibit C.

Thereafter, on June 26, 1991, plaintiff filed a complaint with this Court. Plaintiff's complaint alleged that the defendant, through its agents, conducted the surveillance of Martini and Afdahl in a negligent and wrongful manner. Specifically, the complaint alleged that the FBI agents responsible for the surveillance of Martini and Afdahl failed "to follow and/or implement valid, established FBI pro-

---

**2.** The Federal Tort Claims Act gives federal courts jurisdiction to hear actions

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of

his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C.A. § 1346(b) (1993).

cedures and regulations" in the tailing and apprehension of the assailants. Complaint, First Count at ¶ 18. The complaint charged that, as a result of agents' negligence, the decedent suffered fatal injuries and that the plaintiff has suffered, and will continue to suffer, substantial pecuniary loss and severe emotional distress. *Id.* at ¶¶ 24, 25.

Defendant filed its answer on September 23, 1991. Defendant then filed its initial motion for summary judgment and/or to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[3] In support of its motion for summary judgment, defendant claimed that to be immune from suit by virtue of the discretionary function exception to the Federal Tort Claims Act, which is codified at 28 U.S.C. § 2680(a). Defendant contended that the FBI actions that plaintiff challenged involved elements of judgment and choice and were based upon considerations of public policy. Therefore, defendant maintained that the agents' actions fell within the discretionary function exception. Declaration of John Walker ("Walker Decl.") ¶¶ 4–7. Defendant further argued that, because such actions cannot form the basis of a suit under the Federal Tort Claims Act, there existed no genuine issue as to any material fact and defendant was entitled to judgment as a matter of law.

Plaintiff countered that summary judgment was inappropriate because there existed genuine issues of material fact concerning the surveillance operations of the FBI. Plaintiff also argued that defendant's actions did not fall within the discretionary function exception to the Federal Tort Claims Act.

On April 14, 1992, this Court issued an opinion holding that the Federal Bureau of Investigation's actions in surveilling the kidnappers fell within the discretionary function exception to the Federal Tort Claims Act.

Accordingly, the Court granted defendant's motion for summary judgment.

Plaintiff appealed this Court's determination to the United States Court of Appeals for the Third Circuit. The Third Circuit, in an opinion filed on December 31, 1992, determined that adjudication of the summary judgment motion should be postponed until plaintiff could examine the content of the rules and regulations contained in the FBI's Manual of Internal Operating Guidelines. Accordingly, the Third Circuit vacated this Court's decision and remanded the case for further proceedings consistent with its December 31, 1992, opinion.

After plaintiff received and examined the relevant provisions of the FBI's Manual of Internal Operating Guidelines, defendant renewed its motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment. In support of its motion, defendant contends that the agents' acts fall within the discretionary function exception to the Federal Tort Claims Act. Defendant claims that the internal operating manual of the FBI is merely a guideline which did not prescribe a specific course of action for situations such as the one giving rise to this dispute. Accordingly, defendant asserts, plaintiff's complaint should be dismissed for lack of subject matter jurisdiction or, in the alternative, for summary judgment.

Plaintiff disputes defendant's assertion that the agents had discretion to terminate the surveillance. Plaintiff contends that the internal operating manual of the FBI makes clear that a subject of a close mobile surveillance must be kept under surveillance at all times.[4] Thus, plaintiff contends, the agents had no authority to terminate the surveillance, and their actions do not fall within the discretionary function exception.

---

**3.** Federal Rule of Civil Procedure 12(b) provides that a motion to dismiss for failure to state a claim upon which relief can be granted is to be converted into a motion for summary judgment whenever matters outside the pleading are presented to and accepted by the Court. *See Fed. R.Civ.P.* 12(b); C. Wright and A. Miller, Federal Practice and Procedure: Civil 2d § 1366 (1990). Because this Court has received affidavits and certifications from both plaintiff and defendant,

the motion before the Court shall be treated as a motion for summary judgment.

**4.** Plaintiff does not dispute that the agents had authority to determine whether and in what manner to conduct a surveillance. Rather, plaintiff contends that, once the agents initiated the surveillance, they were required to follow provisions of the internal operating manual governing close surveillance.

## III. *DISCUSSION*

### A. The Standard To Be Applied To A Motion For Summary Judgment

A court may grant summary judgment only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

At the summary judgment stage, the judge's function is not to weigh the evidence and discern the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.* at 248, 106 S.Ct. at 2510. A fact is material if it influences the outcome of the action under the governing substantive law. *Id.*

Thus, the moving party basically bears two burdens. First, the moving party bears the burden of production, of making a prima facie showing that it is entitled to summary judgment. Once such a showing is made, this burden shifts to the nonmoving party, who must prove that the moving party is not entitled to summary judgment. Second, the moving party bears the burden of persuasion. This burden is a stringent one which always remains with the moving party. If there remains any doubt as to whether a trial is necessary, summary judgment should not be granted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 330–33, 106 S.Ct. 2548, 2556–58, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970); *see generally* C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d § 2727 (1983).

### B. The Federal Tort Claims Act And The Discretionary Function Exception

The Federal Tort Claims Act provides for lawsuits against the United States

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C.A. § 1346(b) (West 1993). Thus, the Federal Tort Claims Act authorizes liability on the part of the United States "in the same manner and to the same extent as a private individual under similar circumstances." 28 U.S.C.A. § 2674 (West 1993 Supp.).

One exception to this waiver of immunity is commonly referred to as the "discretionary function exception." This exception states that no liability shall lie for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C.A. § 2680(a) (West 1993 Supp.). As the United States Supreme Court has consistently noted, this exception "'marks the boundary between Congress['s] willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988) (quoting *United States v. Varig Airlines,* 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984)).

■ Since the inception of the Federal Tort Claims Act and the discretionary function exception, numerous cases have confronted the issue of whether a governmental actor's conduct falls within the exception. *See, e.g., United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Pooler v.*

*United States*, 787 F.2d 868 (3d Cir.), *cert. denied*, 479 U.S. 849, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986); *Amato v. United States*, 549 F.Supp. 863 (D.N.J.1982), *aff'd*, 729 F.2d 1445 (3d Cir.1984); *Downs v. United States*, 522 F.2d 990 (6th Cir.1975); *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). This caselaw has precipitated an evolving body of jurisprudence dealing with the applicability of the discretionary function exception.[5]

▮▮▮ To fall within the discretionary function exception to § 1346(b), the government actor's conduct must be discretionary in nature, in that it must involve an element of judgment or choice. *Berkovitz v. U.S.*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1987). Whether the actor's conduct involves an element of judgment or choice is contingent on the nature of the actor's conduct, not the actor's status. *U.S. v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991). If a federal statute, rule or regulation dictates a particular course of action,[6] then the actor's conduct can not involve an element of judgment or choice, "because 'the employee has no rightful option but to adhere to the directive.'"

*Id.* (quoting *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958–59).[7] If the challenged conduct does involve an element of judgment or choice, however, the next issue is "'whether that judgment is of the kind that the discretionary function was designed to shield.'" *Id.* at 322–23, 111 S.Ct. at 1273–74 (quoting *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1959). Additionally, if established governmental policy affords the government agent the ability to exercise discretion, the Court must presume that the acts the agent commits while exercising that discretion are grounded in policy. *Id.* Accordingly, a complaint will survive a motion to dismiss only to the extent it alleges facts supportive of a finding that the challenged actions of the agent are not grounded in the governmental policy of the regulatory scheme. *Id.* at 324–25, 111 S.Ct. at 1274–75. This determination focuses on the nature of the agent's actions and whether they are subject to policy analysis. *Id.* at 325, 111 S.Ct. at 1275.

▮▮▮ Plaintiff's principal argument is that the Guidelines closely regulate close surveillance, and that the agents' conduct in this case does not fit within the discretionary

5. Courts' analysis of the discretionary function exception has evolved substantially since the Supreme Court first discussed the exception in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In *Dalehite*, the Court distinguished decisions made at the planning level, which constituted discretionary functions, from operational level decisions, which did not constitute discretionary functions. Decisions following *Dalehite*, in an attempt to shape the limited legislative history and the language of *Dalehite* into a clear standard by which to determine whether a government agent's actions fall within the exception, distinguished between activities conducted on the planning level and activities conducted on the operational level. *See e.g., Mahler v. United States*, 306 F.2d 713 (3d Cir.), *cert. denied*, 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962). These decisions regarded discretionary acts of government agents at the planning level as within the exception and discretionary acts at the operational level as outside the exception. *See Downs v. United States*, 522 F.2d 990, 997 (6th Cir.1975).

In *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the Supreme Court strayed from this distinction and held that "[i]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a

given case." *Id.* at 813, 104 S.Ct. at 2764. It was not until recently, however, that the Supreme Court explicitly rejected the differentiation between planning-level activities and operational-level activities. *See U.S. v. Gaubert*, 499 U.S. 315, 325–26, 111 S.Ct. 1267, 1275–76, 113 L.Ed.2d 335 (1991). The Court in *Gaubert* expressly repudiated the assertion that the discretionary function exception protects only those acts of negligence which occur in the course of establishing policy rather than acts of negligence which occur in the course of day-to-day activities. *Id.* Instead, the Court looked to whether the challenged actions involved the exercise of discretion in furtherance of public policy goals. *Id.* It is this interpretation of the discretionary function exception by which the Court is governed.

6. It should be noted that the government may mandate conduct in a variety of ways, including comprehensive regulatory schemes, administration of agency programs, adjudicatory proceedings and internal operating guidelines. *See U.S. v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991).

7. It is clear, and neither party disputes, that the internal operating guidelines or policy manuals of a governmental entity fall within this category.

function exception. Plaintiff claims that section 9–2.3 of the Guidelines specifically mandates that agents conducting a close surveillance not lose track of the subject. This argument, however, fails in one important aspect—it does not recognize that that provision's purpose is not to mandate particular behavior during a close surveillance, but rather to dichotomize in a definitional sense "close surveillance" from other forms of surveillance. This point is amply illustrated by the fact that section 9–2.1 describes "fixed surveillances," section 9–2.2 describes "mobile surveillances," and section 9–2.4 describes "loose surveillances." None of these definitional provisions purports to prescribe particular acts or conduct, but instead merely distinguishes each form of surveillance from the other forms.[8]

Moreover, several portions of the Guidelines strongly indicate that discretion inheres to several aspects of surveillances. For example, the general guidelines to the surveillance section of the Guidelines instruct that agents should exercise very cautiously their discretion to conduct any type of surveillance, because this tactic is expensive.[9] Most telling, however, is the first paragraph of the general guidelines, which notes that "[t]he maintenance of surveillances requires the use of the utmost discretion, common sense, and good judgment on the part of Bureau personnel. Arbitrary rules cannot be laid down or adhered to for this type of investigative procedure." *See id.* at § 9–1(1). Accordingly, there can be little doubt that the Guidelines promulgate no strict procedures for close surveillance, but instead describe each form of surveillance in very broad terms and leave

it to the agents to determine whether and how to conduct it. These provisions amply bolster and support the factual assertions contained in the affidavits of agents Walker and Stephens. Agent Walker asserts that "[t]he relevant rules, regulations, statutes, directives and guidelines of the FBI do not mandate [a] specifically prescribed course of action but provide the investigating agent with the option of using his or her discretion and judgment in conducting kidnapping investigations." Walker Affidavit at ¶ 4. Agent Stephens makes the same assertion, and also notes that "[i]t is left to the agent's discretion to determine how best to conduct an investigation, while taking into account the delicate balance between the public, social, and economic policies of the FBI and the safety of the victim." Stephens Declaration at ¶¶ 4–5.

The United States Court of Appeals for the Third Circuit's decision in *Pooler v. United States,* 787 F.2d 868 (3d Cir.), *cert. denied,* 479 U.S. 849, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986), is particularly relevant to the instant motion. In that case, the Third Circuit held that a police officer's decisions during an investigation into marijuana dealing at a Veterans Administration hospital, as well as his decision to file complaints with state authorities, fell within the discretionary function exception. In *Pooler,* a police officer hired by the VA Medical Center in Coatsville, Pennsylvania launched an investigation into narcotics sales at the VA hospital. *Id.* at 869. The investigation culminated in the arrests of two individuals for selling marijuana. *Id.*

---

8. Section 9–2 provides in relevant part:

*9–2   TYPES OF SURVEILLANCES*
*9–2.1   Fixed Surveillances*
(1) These are surveillances often referred to as plants, where the Agents are stationed in one location and usually involve the surveillance of a place to determine the activities and the identity of persons who frequent this location.
*9–2.2   Mobile Surveillances*
This is a moving surveillance. These types of surveillance may be broken down into the following categories:
*9–2.3   Close Surveillances*
Where it is necessary to keep the subjects or suspects under surveillance at all times.

*9–2.4   Loose Surveillances*
All surveillances which may be conducted as spot checks to determine the contacts or activities of the subjects or suspects or where it may be proper to drop the surveillance temporarily rather than risk the chance of being "made." This type of surveillance is sometimes desirable in very discreet investigations involving subjects whose habits and contacts are so well known that they can be readily located again if it becomes desirable to temporarily drop the surveillance.

9. Section 9–1(3) provides that "[s]urveillances are expensive as they tie up manpower and should not be resorted to unless results can reasonably be expected."

After the charges against the individuals were *nolle prossed*, they brought suit against the United States, claiming that the officer's investigation and prosecution of charges against them were deficient in several respects. *Id.* Specifically, the individuals claimed that the officer engaged the services of an unreliable informant with known prior drug involvement, that the officer failed to direct the informant how to conduct himself to avoid violating the constitutional rights of those he approached as an informant, that the officer relied solely on the uncorroborated statements of the informant in determining the individuals sole marijuana, and that the officer filed the complaint against the individuals in bad faith. *Id.*

Concluding that the officer's conduct during the investigation fell within the discretionary function exception, the Third Circuit relied upon *Bernitsky v. United States,* 620 F.2d 948 (3d Cir.1980) and *General Public Utilities Corp. v. United States,* 745 F.2d 239 (3d Cir.1984) to hold that "when the sole complaint is addressed, as here, to the quality of the investigation as judged by its outcome, the discretionary function should, and we hold, does apply. Congress did not intend to provide for judicial review of the quality of investigative efforts." *Id.* 787 F.2d at 871.

This Court's analysis of the instant case compels it to reach the same conclusion as to the FBI's conduct in attempting to apprehend Martini and rescue Irving Flax. The supplemental interrogatories and discovered portions of the FBI's internal operating manual provide no basis for concluding that agents who have lost the subject of a close surveillance do not have discretion to terminate that search. While the regulations, rules and policies governing the FBI provide broad-based and general guidelines, the very nature of close surveillance suggests that the investigating agent must be afforded a significant level of discretion as to how the search will be conducted. *See also Rourke v. United States,* 744 F.Supp. 100 (E.D.Pa.1988), *aff'd,* 909 F.2d 1477 (3d Cir.1990); *Pooler v. United States,* 787 F.2d 868 (3d Cir.), *cert. denied,* 479 U.S. 849, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986); *Amato v. United States,*

549 F.Supp. 863 (D.N.J.1982), *aff'd,* 729 F.2d 1445 (3d Cir.1984). And, while the Court is not unmindful of the tragic events that ensued after the agents lost the kidnappers, it can not conclude that the government should be faulted for the investigation's outcome.

Nor can it be said that the agents surveilling Martini and Afdahl abused their discretion by acting outside of the policy considerations that inhered to their discretion. In conducting the surveillance, the agents had to balance several competing concerns, all of which are grounded in considerations of public policy. Foremost among these considerations is balancing the potentially conflicting interests of apprehending the kidnappers but minimizing the risk of harm to the victim. Specifically, the agents were required to remain sufficiently close to Martini and Afdahl, but had to avoid alerting them of the surveillance, which would have presented a grave risk of injury to the victim. As a general matter this practice is extremely difficult, and is exacerbated where, as here, the surveillance came about as the result of a sudden and unexpected emergency, and had to be conducted in a major urban area with heavy traffic flow. Clearly, no policy guideline or regulation could dictate the exact course of pursuit the agents were to take, and this situation demanded that the agents exercise their discretion throughout the entire surveillance. Additionally, it is equally clear that the agents, who were required to attempt to apprehend the kidnappers but minimize the risk of harm to the victim during the surveillance, did not abuse this discretion by losing track of Martini and Afdahl. Therefore, this Court must conclude that the judgment exercised by the agents was the type that the Congress intended the discretionary function to shield. *See Gaubert,* 499 U.S. at 322, 111 S.Ct. at 1273 (quoting *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958–59). Accordingly, the Court concludes that the actions of the FBI agents fall within the discretionary function exception to the Federal Tort Claims Act. *See also Pooler,* 787 F.2d at 868, 871 (3d Cir.1986) (holding that government agent responsible for investigation exercised discretion as to use of and control over informant, and agent's actions

were protected by discretionary function exception).

## IV. *CONCLUSION*

It is apparent that the actions of the FBI agents fall within the discretionary function exception to the Federal Tort Claims Act. The supplemental discovery plaintiff conducted subsequent to the issuance of the Order of the United States Court of Appeals discloses nothing to indicate the existence of rules or regulations directing the agents to continue surveillance once they had lost track of the kidnapper.

Moreover, this Court is convinced that the agents were empowered with the discretion to make policy judgments regarding how best to locate the victim, minimize the risk to his safety and apprehend the kidnappers. Although it may now be tempting to second-guess the agents' actions, it is clear that any approach they could have taken would have involved a tremendous amount of risk. The calculated risks inherent in the approach that the agents ultimately took were grounded in the legitimate policy concerns of preserving the victim's life while attempting to complete a successful surveillance, and were taken pursuant to a specific grant of authority to the agents. *See Pooler,* 787 F.2d at 871; *Cisco v. U.S.,* 768 F.2d 788, 789 (7th Cir. 1985); *Redmond v. U.S.,* 518 F.2d 811, 816–17 (7th Cir.1975) (citing *U.S. v. Faneca,* 332 F.2d 872, 875 (5th Cir.), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1964)). Therefore, the Court is convinced that the actions forming the gravamen of plaintiff's complaint involved an exercise of policy-based judgment that the discretionary function was designed to protect. Accordingly, plaintiff's contentions present no triable issue of material fact, and defendant is entitled to summary judgment as a matter of law. An Order granting summary judgment in favor of defendant, United States of America, shall issue.