Felicia PRIAH, et al., Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 1:06CV2196.

United States District Court, N.D. Ohio, Eastern Division.

Sept. 30, 2008.

As Amended Jan. 27, 2009.

Daniel R. Haude, Reminger & Reminger, Cleveland, OH, for Plaintiff.

Lynne Haddad Buck, Office of the U.S. Attorney, Cleveland, OH, for Defendant.

## OPINION AND ORDER

CHRISTOPHER A. BOYKO, District Judge.

This matter is before the Court on the Report and Recommendation of the Magistrate Judge recommending the Court grant, in part, and deny, in part, Defendant United States of America's Motion to Dismiss the Second Amended Complaint or in the Alternative Motion for Summary Judgment (ECF 61). For the following reasons, the Court Modifies, in Part, and Accepts and Adopts the Magistrate Judge's Report and Recommendation. As a result, Plaintiff's Complaint is dismissed pursuant to Fed. R. Civ. P 12(b)(1) with respect to its Federal Tort Claims Act (FTCA) claims that allege negligence by Defendant in the planning, investigation and operation of the attempted rescue/arrest. Furthermore, the Court grants summary judgment for Defendant on Plaintiff's FTCA claim for wrongful death.

## FACTS

Darnell Lester ("Lester"), a cooperating government witness, was kidnapped and subsequently shot during a failed rescue attempt by agents of the Federal Bureau of Investigation ("FBI"). Many of the facts found in the state [1] and federal [2] trials against Lester's kidnappers are not disputed. However, Felicia Priah [3] ("Priah"), Plaintiff, contests some of these key facts found during the trials.

The Magistrate Judge found the following facts pertinent to the dispute at hand:

After being arrested on drug charges in 2002, Darnell Lester became a cooperating witness for the FBI, living in Cleveland but working under control of Special Agent Brian O'Roarke, an agent in the FBI's New York Office.

In December 2003, while not then involved in any active FBI investigation, Lester, in the company of others, drove a GMC van to an inner city food store in Cleveland. There, he encountered some individuals who eventually, at gunpoint, overpowered Lester, forced him into the back of the van, beat him, and ordered the others out. The released occupants quickly told various people, including Priah, that Lester had been kidnapped. Special Agent O'Roarke received a phone call in New York from Lester himself that night in which Lester, speaking as if O'Roarke was his "dealer," was uncharacteristically nervous and using "street jargon," which alarmed O'Roarke. After reporting the incident to superiors, O'Roarke was able to re-connect with Lester and concluded, on the basis of yes-and-no questions, that Lester could not speak freely and so was probably kidnapped and being held for a ransom of either drugs or money. (ECF # 61; see also Mag. Rep. at 3.)

---

1. *State v. Ervin,* 2006–Ohio–4498.

2. *United States v. Ervin,* 209 Fed.Appx. 519 (6th Cir.2006).

3. Priah is Darnell Lester's mother and is Administratrix of his estate.

Throughout the night, Lester was in contact with Special Agent O'Roarke. O'Roarke informed the Cleveland FBI and plans were made to engage a SWAT team to rescue Lester. The FBI tried to trace Lester's cell phone signal but was unsuccessful. The Cleveland FBI arranged to meet Lester's captors in a Rally's restaurant parking lot at 1:00 a.m. on December 23, 2003.

The SWAT team and FBI met at Rally's. The parties agree the SWAT team was not told prior to the rescue attempt that Lester would be in the vehicle. Priah contends the FBI knew for more than one hour prior to the rescue attempt that Lester would be in the vehicle but did not relay this information to the SWAT team. Priah states the FBI told the SWAT team Lester would not be in the vehicle. The Magistrate Judge described what happened next:

> When agents deployed to the meeting site received word that the kidnappers' vehicle, a GMC Jimmy, had arrived at the parking lot, the SWAT team converged, boxing the Jimmy in with FBI vehicles, as agents left their cars to cover the scene with drawn weapons. However, the kidnappers then suddenly surged the Jimmy forward, breaking the containment and, in an attempt to escape the street, drove their vehicle at high speed near Special Agent Todd Werth, one of the agents standing in the parking lot providing cover for the rescue operation. Believing his life to be in imminent danger, a fact disputed here by Priah, Special Agent Werth fired three shots into the speeding Jimmy, one of which struck and killed Lester, who was in the front passenger seat. (ECF # 61; *see also* Mag. Rep. at 5.)

Lester's kidnappers were later charged and convicted in both state and federal court on several counts. Priah, as representative of Lester's estate, filed a FTCA suit against the United States alleging wrongful death, negligence, gross negligence and reckless and wanton conduct by FBI agents on September 9, 2006. In the original suit, several of Lester's children were named as Plaintiffs. Priah conceded that Priah alone is the only proper plaintiff and the other plaintiffs named should remain "claimants" under Ohio's wrongful death statute. On January 3, 2007, the Government filed a Motion to Dismiss the Case, or in the alternative, a Motion for Summary Judgment. Priah filed a response in objection to the Motion to Dismiss, or alternatively, for summary judgment. Upon the filing of a Second Amended Complaint and subsequent briefing, the case was referred to the Magistrate Judge for a Report and Recommendation. The Report and Recommendation was issued on January 25, 2008. Both sides have filed objections and/or clarifications to the Report and Recommendation.

# I. FEDERAL TORT CLAIMS ACT CLAIM ("FTCA")

## A. STANDARD OF REVIEW

█ The Government filed a Motion to Dismiss, or in the alternative, a Motion for Summary Judgment. The Magistrate Judge's Report and Recommendation treats Priah's claims regarding negligence in the planning, investigation and operation of the rescue/arrest under the FTCA as a Motion to Dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. The Sixth Circuit stated the standard in analyzing a motion to dismiss for failure to state a claim:

> Whether a district court properly dismisses a suit pursuant to Rule 12(b)(6) is a question of law subject to de novo review. The Supreme Court has recently clarified the law with respect to what a plaintiff must plead in order to survive

a Rule 12(b)(6) motion. The Court stated that a "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Additionally, the Court emphasized that even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegation must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." In so doing, the Court disavowed the oft-quoted Rule 12(b)(6) standard of *Conley v. Gibson* (recognizing the "accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that a plaintiff could prove no set of facts in support of his claim that would entitle him to relief"), characterizing that rule as one "best forgotten as an incomplete, negative gloss on an accepted pleading standard."

*Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545 (6th Cir.2007).

The Defendant's Motion to Dismiss was brought under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Fed.R.Civ.P. 12(b)(1) states in pertinent part:

Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter....

Fed R. Civ. P. 12 goes on to state:

If, *on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56,* and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. (Emphasis added).

When challenged on a Motion to Dismiss, it is Plaintiff's burden to prove the existence of subject matter jurisdiction. *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir.1986). The most common method of challenging subject matter jurisdiction is on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1). Such challenges are brought by two different methods: (1) facial attacks; and (2) factual attacks. *See, e.g., United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994).

"A *facial* attack is a challenge to the sufficiency of the pleading itself. On such a motion, the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *Walters v. Leavitt*, 376 F.Supp.2d 746, 752 (E.D.Mich. 2005), *citing Scheuer v. Rhodes*, 416 U.S. 232, 235–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "A *factual* attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction. On such a motion, no presumptive truthfulness applies to the factual allegations, .... and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. But the fact that the court takes evidence for the purpose of deciding the jurisdictional issue does not mean that factual findings are therefore binding in future proceedings." *Walters* at 752. (Citation omitted).

The Court finds the subject matter jurisdiction challenge made by Defendant is a factual attack, as this Court is asked to

determine whether the policies and procedures of the United States, coupled with the particular factual circumstances, mandate a course of action by its agents or confer upon the agent discretion to accomplish the task. Therefore, the Magistrate Judge was free to consider evidence outside the pleadings to determine subject matter jurisdiction.

## B. GOVERNMENT IS ENTITLED TO JUDGMENT BASED ON THE DISCRETIONARY FUNCTION EXCEPTION TO FTCA

Under 28 U.S.C. § 2674, the United States consents to be sued for certain torts committed by an employee, subject to certain exceptions, "in the same manner and to the same extent as a private individual under like circumstances." One exception is the discretionary function exception, under 28 U.S.C. § 2680(a), which provides that if the claim is based on a federal employees performance or failure to perform "any discretionary function or duty," federal courts lack jurisdiction to hear the claim. It is irrelevant whether there was an abuse of discretion.

In assessing whether the conduct falls under the discretionary exception, the Court first asks if the conduct involves a matter of choice for the employee. *Berkovitz v. U.S.*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). If the conduct does involve a matter of choice, the Court determines "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.*

Plaintiff argues, after reviewing unredacted FBI manuals and policies applicable to hostage rescue situations:

(1) that the FBI violated "dozens" of its written policies by either (a) proceeding with the rescue attempt without knowing for certain where Lester was, or (b) affirmatively misstating to the SWAT team before commencing the operation that Lester would not be in the kidnappers' vehicle; (2) that these policies which were allegedly violated are mandatory, such that an agent has no discretion to fail to account for the correct location of a kidnap victim or to transmit erroneous information; and (3) even if the various policies here are not mandatory and the agent's conduct here was discretionary, the discretionary function exception was not intended to shield agents from liability for "forgetting to communicate and/or inquire about the whereabouts of the [kidnap] victim." (ECF # 61; *see also* Mag. Rep. at 14.)

The Magistrate Judge determined the applicable written policies of the FBI were not mandatory. In *Flax v. U.S.*, 847 F.Supp. 1183, 1189 (D.N.J.1994), the Court applied the discretionary function exception to the FBI's conduct in a kidnapping surveillance investigation. The FBI chose to terminate the rescue search because they lost the location of the hostage. *Id.* at 1185. Tragically, the hostage, having been shot to death, was discovered the following day. *Id.* The Court found the FBI's "rules, regulations, statutes, directives and guidelines of the FBI [did] not mandate [a] specific course of action but provide[s] the investigating agent with the option of using his or her discretion and judgment in conducting kidnapping investigations." *Id.* at 1189. The Government, in its response, notes that all the relevant documents in this case-the FBI's Manual of Internal Operating Guidelines (MIOG), the SWAT Team Leaders Handbook, and the SWAT Lesson Plan Manual-are not mandatory directives but "general checklists and training outlines which do not mandate any course of action but rather set forth elements and general factors to consider in SWAT operations." (ECF # 60.) Similar to the court in *Flax*, the Magistrate Judge found that applicable directives in place, regarding kidnapping

and hostage rescue situations, fall within the discretion of an FBI employee. The Magistrate Judge held the MIOGs and related manuals and handbooks at issue were not mandatory but are discretionary based on the relevant precedent and the language of the manuals themselves.

### C. OBJECTIONS TO THE REPORT AND RECOMMENDATION

Plaintiff and Defendant timely filed objections to the Report and Recommendation of the Magistrate Judge. A District Judge shall make a *de novo* determination of those portions of the Magistrate's Report and Recommendation to which objection is made. 28 U.S.C. § 636(b)(1). A District Judge may accept, reject, or modify, in whole or in part, the recommendations made by the Magistrate Judge. *Id.* "Any party that desires plenary consideration by the Article III judge ... need only ask." *Thomas v. Arn,* 474 U.S. 140, 154, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). Defendants timely filed their Objections so they are entitled to a *de novo* review of the Magistrate Judge's recommendations.

Plaintiff raises several objections to the Magistrate Judge's Report and Recommendation. First, Plaintiff contends the Magistrate Judge misapplied relevant case law on the discretionary function exception to the FTCA. Second, Plaintiff contends the Magistrate Judge failed to analyze in any meaningful way the contested MIOGs. Rather than dissecting and discussing each contested MIOG, Plaintiff argues the Magistrate Judge made a conclusory judgment that the MIOGS were not mandatory in spite of relevant case law to the contrary. The Magistrate Judge made the same determination on the FBI's SWAT Team Leader Handbook and other FBI manuals. Also, Plaintiff contends the Magistrate Judge improperly recommends summary judgment in favor of Defendant when evidence exists creating a genuine issue of fact that the use of deadly force was im-

proper. Particularly, the Magistrate Judge, according to Plaintiff, gives preclusive and binding effect to findings of fact in the criminal trials of the kidnappers when no such preclusive effect can be made when there exists no privity of parties.

Defendant made limited objections to correct what it considers obvious errors in the Magistrate Judge's Report and Recommendation. First, the Report recommends Defendants Motion be "denied in part and granted in part." However, Defendant argues the body of the Report clearly recommends granting Defendant's Motion on all claims. Further, the Defendant objects to the Magistrate Judge's statement that the FBI attempted to trace decedent's cell phone signal for "nearly a day." Rather, the entire operation from the first time decedent contacted the FBI at 9:00 PM on December 22 to the actual SWAT team intercept, occurring on December 23 around 1:00 AM, took approximately four hours. Also, the Magistrate Judge granted summary judgment on Plaintiff's claim of individual liability of special agent Werth when no such claim was ever raised by Plaintiff.

### II. LAW and ANALYSIS

As a threshold issue, the Court adopts the Defendant's suggested modifications to the Magistrate Judge's Report and Recommendation. The Court finds the Magistrate Judge intended to grant relief on all claims sought by Defendant and the Court modifies the Report and Recommendation accordingly. The Court also modifies the Report and Recommendation to show that no claim of individual liability of Agent Werth was made by Plaintiff. Also, the Court modifies the Magistrate Judge's Report and Recommendation to correct the discrepancy on pages 18 and 26 as to the basis for the Magistrate Judge's recommended dismissal. Because the analysis

and conclusion of the Magistrate Judge on Plaintiff's FTCA claim was based on a lack of subject matter jurisdiction due to the discretionary function exception, the Court finds the Magistrate Judge's Report and Recommendation recommending dismissal is based on lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) and not failure to state a claim under Fed.R.Civ.P. 12(b)(6).

### A. The Magistrate Judge's legal standard

■ The United States Supreme Court has developed a two-prong test to govern the application of the discretionary function exception. First, the conduct must involve "an element of judgment or choice." *U.S. v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335, (1991); see also *Berkovitz v. U.S.*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). "In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz* at 536, 108 S.Ct. 1954. "Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* Second, the Court must determine "whether that judgment is the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322–23, 111 S.Ct. 1267; *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. "The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537, 108 S.Ct. 1954. "[T]he purpose of the exception is to 'prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy

through the medium of an action in tort.'" *Gaubert* at 323, 111 S.Ct. 1267.

■ Plaintiff contends the Magistrate Judge added a proximate cause prong to the Berkovitz discretionary function test requiring Plaintiff demonstrate a causal connection between the alleged non-discretionary conduct and Plaintiff's injury. In his Report and Recommendation, the Magistrate Judge, at pages 12–13, properly articulated the standard of review and requirements for determining whether a discretionary function exception exists. However, at page 15 of the Report and Recommendation, the Magistrate Judge stated, "as to the initial step-identifying the government action that caused the harm complained of ..." Again, at page 16 of the Report and Recommendation the Magistrate Judge stated, "....I am not convinced that Priah has satisfied the first requirement for a discretionary function analysis to apply here: identifying a governmental action that caused the harm complained of." The Magistrate Judge held that the two prong test in *Berkovitz* in practice involves a third step; identifying the injurious conduct. Plaintiff is correct that *Berkovitz* imposes no proximate cause prong. To hold Defendant liable under the FTCA, Plaintiff must identify some nondiscretionary tortious conduct by the Defendant or its agents which caused the complained of injury. See 28 U.S.C. § 1346(b). However, the analysis of whether the identified conduct proximately caused Plaintiff's injury should not be addressed until the Court first determines whether the identified conduct was discretionary because the proximate cause analysis applies to the merits of the claims while the discretionary nature of the conduct applies to the Court's subject matter jurisdiction to hear the claims. The Court interprets the Magistrate Judge's Report to mean courts must identify the conduct of the Defendant that is the basis of the claim. It does not mean a court may

engage in a proximate cause analysis in the course of its discretionary function analysis. Therefore, the Court concurs with the Plaintiff that there is no proximate cause component in a discretionary function analysis under the FTCA and the Court will not consider such analysis in determining Defendant's discretionary function defense.

### B. The Magistrate Judge Improperly Determined the MIOGS and Manuals Were Not Mandatory

■ Plaintiff contends the Magistrate Judge erred in finding the MIOGS, handbooks and manuals in question were not mandatory, claiming a plain reading of the above and applicable case law demonstrate they are mandatory.

The Court finds the Magistrate Judge properly considered the applicable MIOGS, handbooks and manuals and properly held that under federal case law criminal law enforcement decisions when discretionary, are immune from judicial scrutiny. The Magistrate Judge cited a federal district court case out of Florida that itself cited numerous decisions around the country supporting the Magistrate Judge's conclusion. The Magistrate Judge then discussed the applicable FBI manuals and policies "read in their entirety" as conferring discretion upon agents. The Magistrate Judge further stated, "the individual elements of these manuals cited by Priah do not, and could not, standing alone and with no relationship to other objectives and circumstances, constitute binding, mandatory injunctions on agents." The Court finds the Magistrate Judge purported to have reviewed all the relevant material and his failure to recite each of the alleged 41 mandatory clauses of FBI manuals, handbook and MIOGS does not mean they were not considered in his analysis.

The Court also finds the applicable MIOGS, handbook and manuals lack imperative language. The terms "must", "shall" "will" and similar commands are not found in the applicable regulations. Nor can Plaintiff cite to case law, regulations or codes demonstrating the above are mandatory. In fact, many of the policies or regulations Plaintiff alleges are mandatory contain express language to the contrary. For example, Plaintiff contends FBI SWAT Team Leader Handbook under a section titled, "Emergency Assault Plan (EAP)" "mandates the location of the hostage (Darnell Lester) is specifically required to be known by the SWAT Team and included in the Emergency Assault Plan." (Plaintiff Objection at 4). However, the checklist contains no such reference to the hostage's location. Also, the EAP section states its development is continuously modified as additional intel becomes available. The purpose of the EAP is for crisis situations and states the EAP lacks contingency planning, preparation, rehearsal and full tactical capabilities and presents extremely high risk to hostages, subjects and agents. Further, it states that among the elements of a good EAP are its "flexibility." Later, it allows for modification of the EAP "as additional intel develops." Any planning that requires flexibility must necessarily require discretion. Finally, Plaintiff points this Court to no regulation, caselaw or code demonstrating that the FBI SWAT team leader handbook is mandatory. Plaintiff only refers to one MIOG in his Objections and that MIOG is merely a checklist under the title SWAT Tactical Operation Center (TOC), with no mandatory language one way or the other. (It appears Plaintiff mislabeled his Exhibit but the Court was unable to find in his exhibits the relevant MIOG section. What Plaintiff alleges is in the MIOG is not found in the Exhibit he cites for reference.) Therefore, the Court concurs with the Magistrate Judge's Report and Recommendation finding that the relevant

MIOG, handbook and manual are not mandatory and therefore, the Defendant's agents were granted discretion in planning and carrying out the operation that led to Plaintiff's decedent's demise.

### C. The Magistrate Judge Never Considered the Public Policy Analysis Prong of a Discretionary Function Analysis

Contrary to Plaintiff's assertion, the Court finds the Magistrate Judge expressly determined the FBI's investigation, planning and commencing the rescue/arrest efforts are the "very definition of a discretionary decision and the very essence of many law enforcement actions. It is the very thing the discretionary function exception was intended to protect from after-the-fact second guessing . . ." (R & R p. 16.). In support, the Magistrate Judge cited to *Pooler v. United States,* 787 F.2d 868, 871 (3rd Cir.1986) which held, "Congress did not intend to provide for judicial review of the quality of investigative efforts." This Court finds the actions of the FBI agents in investigating, planning and commencing the rescue/arrest were unquestionably in furtherance of public policy considerations; namely, the apprehension of criminal suspects engaged in unlawful activities and the rescue of a kidnapped individual.

Because the decisions made regarding Lester's situation were discretionary and involved the agents' judgment, the Court finds it lacks subject matter jurisdiction to hear claims of negligence in the planning, investigation and operation of the attempted rescue/arrest.

### III. FTCA WRONGFUL DEATH CLAIMS UNDER OHIO LAW

#### A. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary Judgment, pursuant to Rule 56(c) of the Federal Rules of Procedure, is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir.1993). The moving party has the burden to show that no genuine issue of material fact exists:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portion of "the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. "A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e); "If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dept. of Transp.,* 53 F.3d 146, 150 (6th Cir.1995). In deciding this motion, "the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party." *Id.* Summary Judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case. *Tolton v. American Biodyne, Inc.,* 48 F.3d 937, 941 (6th Cir. 1995).

### B. GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT ON THE OHIO WRONGFUL DEATH CLAIMS

■ As the Magistrate Judge correctly concluded, liability for any tort, including wrongful death under the FTCA, is determined by the law the place where the act or omission giving rise to the claim occurred. *Harris v. United States,* 422 F.3d 322, 326–27 (6th Cir.2005). The Sixth Circuit, in *Ewolski v. City of Brunswick,* 287 F.3d 492, 517 (6th Cir.2002), articulated the standard of review for cases alleging wrongful death by employees of a political subdivision in Ohio:

> [A]s employees of a political subdivision [in Ohio], the individual defendants are entitled to statutory immunity unless their "acts or omissions were with malicious purpose, bad faith, or in a wanton or reckless manner." The standard for recklessness employed by Ohio courts holds that "[t]he actor's conduct is in reckless disregard for the safety of others if ... such risk is substantially greater than that which is necessary to make his conduct negligent."

A recklessness standard is applied to Special Agent Werth's actions to determine if his conduct was reasonable. The Magistrate Judge assessed Special Agent Werth's conduct and determined his decision to fire at the kidnappers' vehicle was reasonable under the circumstances. As a result, the Magistrate Judge recommended the Government be granted summary judgment with respect to Plaintiff's FTCA wrongful death claim analyzed under applicable Ohio law. After reviewing the facts undisputed by the parties, the Court agrees with the Magistrate Judge that Special Agent Werth's decision to fire at the kidnappers' vehicle was reasonable and in no way grossly negligent, wanton, malicious or reckless.

Priah argues FBI agents knew, prior to commencing the rescue attempt, Lester would be in the kidnappers' vehicle during the rescue, but either neglected to relay this information to the SWAT team, or provided the SWAT team with directly contrary information. As the Magistrate Judge points out, any dispute in this regard is not actionable for two reasons. First, the Government is entitled to immunity from suit as to how it investigated the abduction and planned the rescue. Second, the proximate cause of Lester's death was the independent decision of Special Agent Werth to fire on the kidnappers' vehicle, and not the consequence of an allegedly faulty plan. Additionally, as noted by the Magistrate Judge, Special Agent Werth's unrebutted testimony was he would have fired on the kidnappers' vehicle under the circumstances existing at the time, whether he knew Lester was inside or not. Thus, whether or not the government is entitled to summary judgment on the wrongful death claims turns on whether Special Agent Werth's decision to fire is actionable or not.

■■ With respect to the decision to fire on the kidnappers' vehicle, Priah maintains a factual question exists as to whether Special Agent Werth acted in bad faith, or in a wanton or reckless manner. Priah argues that since the shots fired by Special Agent Werth hit the kidnappers' vehicle from the side and not the front, and since Special Agent Werth was unable to identify any other agents in the path of the kidnappers' vehicle at the time he fired, this creates a fact question with regard to whether his conduct was reckless. The Magistrate Judge found Priah's arguments contradict legal conclusions previously drawn from non-disputed facts already established at the kidnappers' trials, including two in Ohio state courts and one in federal court, all of which were reviewed

on appeal and upheld. While it may be true these factual issues were previously decided in earlier trials, Plaintiff argues, persuasively, that facts developed at the earlier trials are not binding upon Priah, as she was not a party to the first action, or in privity with a party to the prior action. The doctrine of collateral estoppel "prevents parties or their privities from re-litigating facts and issues in a subsequent suit that were fully litigated in a previous suit." *State ex rel Scripps Howard's Broadcasting Co. v. Cuyahoga County Court of Common Pleas, Juvenile Division* (1995), 73 Ohio St.3d 19, 652 N.E.2d 179 (1924). The doctrine of collateral estoppel applies when the fact or issue:

1. Was actually and directly litigated in the prior action;
2. Was passed upon and determined by a court of competent jurisdiction;
3. When the party against whom collateral estoppel is asserted was a party or or in privity with a party to the prior action.

*Thompson v. Wing* (1994), 70 Ohio St.3d 176, 183, 637 N.E.2d 917; *Rizvi v. St. Elizabeth Hospital Medical Center* (146 Ohio App.3d 103, 108, 765 N.E.2d 395) (Ohio App. 7th Dist.2001). Neither Priah, nor her decedent Lester, were parties to, or in privity with, any of the parties in the earlier criminal cases against the kidnappers, nor was the FBI. As such, Defendant cannot prove prong three of the collateral estoppel doctrine, and although the facts established at previous trials are persuasive, they are not binding on Plaintiff.

Nonetheless, the Court's finding that collateral estoppel does not apply does not dispose of Plaintiff's argument that a genuine issue of material fact exists with regard to whether Special Agent Werth's actions were reckless. First, although Plaintiff argues Special Agent Werth should not have exited his vehicle, there is no duty imposed by Ohio law or FBI regulations to stay in his vehicle. Additionally, Plaintiff's argument that a fact-finder could conclude Special Agent Werth was reckless for firing the second shot (the one that allegedly killed Lester) because the kidnappers' vehicle was no longer coming at him is also without merit. A fact-finder could not reasonably find Special Agent Werth's conduct was reckless with respect to Lester since he did not even know Lester was in the vehicle. Further, Plaintiff's argument that the other FBI team members were not in danger is unpersuasive. While Special Agent Werth testified he did not see other agents, he testified he knew there were 15 to 20 agents in the nearby vicinity (Werth Tr. at 593–94). Senior SWAT Team Leader Kirwan testified he was concerned for Special Agent Werth's and the other agents' safety, and he feared agents could have been injured by the kidnappers. (Kirwan Tr. at 19). He also testified Werth was not the only agent who discharged his firearm. (*Id.* at 27, 30, 35). There is no support for Plaintiff's assertion that Special Agent Werth had a duty to stay in his vehicle, and no support for her assertion that the angle of the bullet suggests Special Agent Werth's conduct was reckless.

The "reasonableness" of a use of force should be judged from the perspective of a reasonable officer on the scene, and not by hindsight. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In considering whether Special Agent Werth was reasonable in his decision to use force, the Magistrate Judge looked to the standard articulated in a recent Sixth Circuit decision. *Bing ex rel. Bing v. City of Whitehall, Ohio*, 456 F.3d 555, 570 (6th Cir.2006). In *Bing*, the Court required an analysis of the totality of the circumstances as they were presented to the officer upon arrival on the scene. *Id.* In the case at bar, Special Agent Werth was confronted with a dangerous situation in which there were known kid-

nappers attempting to resist arrest by fleeing the scene in their SUV, without regard for anything or anyone in their way, while he and other law enforcement officers involved in the operation were in close proximity in the same parking lot, some without the protection of a vehicle. Special Agent Werth's testimony that the kidnappers' SUV initially headed toward him as it broke through the containment barrier of FBI vehicles was corroborated by all of the other witnesses at the scene. Therefore, the Magistrate Judge concluded it was reasonable for Special Agent Werth to fire on the kidnappers' vehicle in order to stop it before it injured him or one of the other team members, whose precise locations he did not know.

Although the Magistrate Judge concluded Special Agent Werth's actions were objectively reasonable, he indicated the Government is not required to meet that test in order to prevail on its motion here. Instead, as previously indicated, the issue is whether an issue of fact remains as to whether Special Agent Werth's actions in using deadly force were grossly negligent or reckless. The Magistrate Judge concluded not only was Special Agent Werth's conduct reasonable, but he cannot, as a matter of law, be found reckless or grossly negligent. There is no evidence Special Agent Werth displayed a reckless disregard for the safety of others in making a discretionary decision to fire upon the vehicle. Even if a fact-finder could conclude Special Agent Werth could have decided not to fire, his conduct still would not rise to a level above mere negligence. Priah has offered no evidence Special Agent Werth acted in bad faith or wantonly; therefore, the Court must accept the Magistrate Judge's decision to grant summary judgment to the Government with respect to the Ohio wrongful death claims.

The Court notes that the Magistrate Judge limited discovery in this case after briefing by the parties. After issuing his ruling, Plaintiff failed to object to the Magistrate Judge's limitation of discovery and has not moved under Fed.R.Civ.P. 56(f) for additional discovery to respond to the summary judgment motion.

This Court also finds the evidence before it does not establish that any FBI agent knew with any degree of certainty that Lester would be in the vehicle. Agent Werth testified, "we had no real specific information. It went back and forth where the victim was. Again, we didn't have a good handle or very specific information on where he was, and that was more of our problem than anything. I believe at that point in time the indications were that he was not going to be in the vehicle." (TR 587–88). No agent testified they knew with certainty Lester was going to be in the vehicle. At the time of the rescue/arrest attempt it was nighttime and raining. Though the testimony of Agent Werth indicates he shot at the escaping suspect vehicle through the driver side window, his unrebutted testimony is that initially the vehicle was headed towards him; a fact upheld by the Sixth Circuit in *United States v. Ervin,* 209 Fed.Appx. 519, 521 (6th Cir.2006) ("... Ervin's attempt to run down the FBI agent caused the agent to shoot in self-defense.") Furthermore, Special Agent Werth testified he feared for the safety of other agents on the scene when the suspect vehicle broke containment and attempted to leave the scene. While it is true he testified he did not see any other agents at the time he shot he did testify he knew there were 15 to 20 agents in the area conducting the stop and when the vehicle broke containment, "he was a threat to me and also to other agents in the area." (TR 637). Werth testified that before the stop they were briefed that an individual was kidnapped who had been cooperating with the FBI and there were five or six individuals involved in the kid-

napping who were armed at least at the time of the kidnapping. (TR 582–83). It was sketchy at the time where the individual would be and the SWAT team traveled to different locations based on the incoming information. (TR 584–85). Given the totality of these circumstances, the Magistrate Judge correctly determined Special Agent Werth's use of deadly force was not unreasonable.

The Magistrate Judge and Government also make a compelling proximate causation argument. The proximate cause of Lester's death was not a policy or procedure of the FBI, but rather, the decision by Special Agent Werth to fire on the kidnappers' vehicle when it came toward him, as he felt himself and other agents to be in danger. *Ervin*, 209 Fed.Appx. at 521. As a result, Lester's death was not caused by an FBI policy or procedure or failure to communicate the whereabouts of Lester. Additionally, Special Agent Werth testified his decision to fire at the vehicle would not have changed had Special Agent Werth known Lester was inside the vehicle. Therefore, the Government's Summary Judgment motion is granted because no genuine issue of material fact exists.

## IV. CONCLUSION

For the foregoing reasons, the Court ACCEPTs and ADOPTS, with modification, the Magistrate Judge's Report and Recommendation dismissing Plaintiff's Second Amended Complaint.

IT IS SO ORDERED.

## *REPORT & RECOMMENDATION*

WILLIAM H. BAUGHMAN, JR., United States Magistrate Judge.

### I. Introduction

Before me[1] are motions by defendant the United States of America to dismiss or, alternatively, to grant summary judgment on[2] the complaint of plaintiffs Felicia Priah (Priah) and others[3] filed pursuant to the Federal Tort Claims Act (FTCA).[4] The complaint alleges negligence and wrongful death by agents of the Federal Bureau of Investigation (FBI) in the shooting of Darnell Lester (Lester), a cooperating government witness, who was killed during a failed attempt to rescue him from a kidnapping. These motions have been opposed,[5] and that opposition replied to,[6] in light of this Court's previous ruling on the scope of permissible discovery in this case.[7] For the reasons that follow, I will recommend that the Government's motion be granted in part and denied in part.

### II. Facts

**A. Kidnapping and shooting of Darnell Lester**

Most of the essential facts of the kidnapping and shooting of Darnell Lester have been established in the state[8] and federal[9]

---

1. These motions have been referred to me for a Report and Recommendation. ECF # 50.

2. ECF # # 14, 23.

3. Priah is the mother of Darnell Lester. She filed individually and as the administrator his estate. Also filing were the decedent's three minor children—Diamond Feneil Lester, Darniesha Burge, and Dakieta Lester—and their respective mothers/guardians: Dana Watkins, Karen Burge and Dakeita Bryant. In addition, Deborah Duckworth, Lester's sister, filed for herself and as the mother/guardian of Ti'Yon Benjamin and Deon Feneil Benjamin,

Lester's minor niece and nephew, who are also named as individual plaintiffs. ECF # 1 at 3–4. The plaintiffs are collectively referred to herein as "Priah."

4. 28 U.S.C. § 2671–2680.

5. ECF ## 34, 55.

6. ECF ## 37, 60.

7. ECF # 49.

8. *State v. Ervin*, No. 87333, 2006 WL 2507563 (Ohio App. 8th Dist. Aug. 31, 2006) (*Ervin-*

actions against Lester's two kidnappers and are not disputed here. However, Priah does contest several of the key facts found by these courts and such disputes will be noted in the following narrative. Where facts are not contested, the state and federal appellate court opinions will be cited as the source for the particular fact being recounted here.

After being arrested on drug charges in 2002, Darnell Lester became a cooperating witness for the FBI, living in Cleveland but working under the control of Special Agent Brian O'Roarke, an agent in the FBI's New York office.[10]

In December 2003, while not then involved in any active FBI investigation, Lester, in the company of others, drove a GMC van to an inner city food store in Cleveland.[11] There, he encountered some individuals who eventually, at gunpoint, overpowered Lester, forced him into the back of the van, beat him, and ordered the others out.[12] The released occupants quickly told various people, including Priah, that Lester had been kidnapped.[13]

Special Agent O'Roarke received a cell phone call in New York from Lester himself that night in which Lester, speaking as if O'Roarke was his "dealer," was uncharacteristically nervous and using "street jargon," which alarmed O'Roarke.[14] After reporting the incident to superiors, O'Roarke was able to re-connect with Lester and concluded, on the basis of yes-and-no questions, that Lester could not speak freely and so was probably kidnapped and being held for a ransom of either drugs or money.[15]

During the rest of that night and into the next day, O'Roarke had 36 short phone conversations with Lester, attempting to arrange an exchange between the kidnappers and O'Roarke as Lester's "dealer."[16] O'Roarke informed the Cleveland FBI office of this situation and that office activated a SWAT team with the objective of rescuing Lester.[17]

In trying to formulate a rescue plan, the FBI in Cleveland could not determine, despite nearly a day of attempting to trace his cell phone signal, the location where Lester was being held.[18] Consequently, the Cleveland FBI SWAT team finally agreed to meet Lester's captors in the parking lot of a fast-food restaurant at 1:00 a.m.[19]

Accordingly, a SWAT team of FBI agents and vehicles was assembled.[20] Although Agent O'Roarke testified at the federal trial concerning his numerous cell phone conversations with Lester that provided the FBI with information as to the number of kidnappers, whether they were armed, and what they were demanding,[21] all parties agree that the SWAT team was not told prior to the rescue attempt that Lester would be in the vehicle at the time

---

Ohio); *State v. Waller*, No. 87279, 2006 WL 2692590 (Ohio App. 8th Dist. Sept. 21, 2006) (*Waller*–Ohio).

**9.** *United States v. Ervin; United States v. Waller*, 209 Fed.Appx. 519 (6th Cir.2006) (*E/W*–Fed.).

**10.** *Ervin*–Ohio, 2006 WL 2507563, at *1.

**11.** *Id.*

**12.** *Id.*

**13.** *Id.*, at *2.

**14.** *Id.*

**15.** *Id.*

**16.** *Id.*

**17.** *Id.*

**18.** *Id.*

**19.** *Id.*

**20.** *Id.; E/W*–Fed., 209 Fed.Appx. 519, 520.

**21.** *E/W*–Fed., 209 Fed.Appx. at 521.

of the attempted rescue.[22] In fact, Priah contends that the FBI knew conclusively for more than one hour before the rescue was attempted that Lester would be in the kidnappers' vehicle, but did not communicate that information to the SWAT team.[23] Priah further argues that the FBI actually told the SWAT team, erroneously, that Lester would not be in that vehicle.[24]

When agents deployed to the meeting site received word that the kidnappers' vehicle, a GMC Jimmy, had arrived at the parking lot, the SWAT team converged, boxing the Jimmy in with FBI vehicles, as agents left their cars to cover the scene with drawn weapons.[25] However, the kidnappers then suddenly surged the Jimmy forward, breaking the containment and, in an attempt to escape to the street, drove their vehicle at high speed near Special Agent Todd Werth, one of the agents standing in the parking lot providing cover for the rescue operation.[26] Believing his life to be in imminent danger,[27] a fact disputed here by Priah, Special Agent Werth fired three shots into the speeding Jimmy, one of which struck and killed Lester,[28] who was in the front passenger seat.[29]

Priah, as noted, vigorously disputes that Special Agent Werth could reasonably have believed his life or the lives of others was in danger at the time he fired the shot that killed Lester. Specifically, Priah asserts that physical evidence shows that Werth's fatal shot was fired as the kidnappers' vehicle was going past, not at, Werth, thus negating any claim of self-defense.[30] Lester's two kidnappers were arrested at the scene [31] and eventually charged with various state and federal crimes, including Lester's murder.[32]

## B. The state and federal trials of Lester's kidnappers

Gary Ervin, who was driving the Jimmy that night, and co-defendant Aubrey Waller pled not guilty in state court to the fifteen-count indictment returned against them by an Ohio grand jury.[33] Accordingly, after a drug possession charge was dropped prior to trial, both men received a jury trial at which they both were eventually convicted of the felony murder of Lester, as well as kidnapping, aggravated robbery, grand theft motor vehicle, six counts of felonious assault on law enforcement agents (including the attempt to run down Special Agent Werth), and carrying a concealed weapon. These convictions were upheld on appeal.[34]

In federal court, Ervin and Waller were tried together before a jury and eventually found guilty of car jacking, assaulting a federal agent, two counts of the use of a firearm during a violent crime, and, solely as to Waller, three counts of attempted murder of a federal officer [35] arising from his shooting at agents after the Jimmy had crashed into a fence attempting to exit the parking lot.[36] Ervin was sentenced to 46

22. *See,* ECF # 14 (Gov't's first motion) at 6.

23. ECF # 18 at ¶¶ 35–37.

24. *Id.*

25. *Ervin–Ohio,* 2006 WL 2507563, at *2.

26. *Id.*

27. *E/W–Fed.,* 209 Fed.Appx. at 521.

28. *Id.*

29. *Ervin–Ohio,* 2006 WL 2507563, at *3.

30. ECF # 34 at 4.

31. *Ervin–Ohio,* 2006 WL 2507563, at *3.

32. *Id.* at *1; *E/W–Fed.,* 209 Fed.Appx. at 520.

33. *Ervin–Ohio,* 2006 WL 2507563, at *1.

34. *Id.; Waller–Ohio,* 2006 WL 2692590, at *2.

35. *E/W–Fed.,* 209 Fed.Appx. at 520.

36. *Id.* at 521.

years in federal prison; Waller received 57 years.[37] The federal convictions and sentences were affirmed on appeal.[38]

## C. The complaint and motion to dismiss

The essential procedural history here involves an initial complaint which was superceded by a second amended complaint that is substantially the same as the first, but adds additional theories of recovery. In the second amended complaint, Priah alleges that FBI agents, contrary to state and federal law, were the direct and proximate cause of Darnell Lester's death[39] when, by their negligent, reckless, grossly negligent, willful, and wanton actions,[40] they: (1) failed to tell the SWAT team that Lester would be in the kidnappers' vehicle at the time of the planned rescue;[41] (2) formulated the plan to "jump" the kidnappers' vehicle and rescue Lester based on the false information that Lester would not be in that vehicle;[42] and (3) fired upon the kidnappers' vehicle at the scene, without any justifiable reason, killing Lester.[43]

The FBI, prior to answering the original complaint, moved to dismiss that complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted, or, alternatively, for summary judgment.[44] In that motion, the Government argues: (1) that the discretionary function exemption to the FTCA bars any recovery for claims based on how the FBI conducted the rescue operation that resulted in Lester's death; and (2) that Ohio law bars claims by all plaintiffs except the administrator of the decedent's estate, that the United States is immune from suit for negligence, and that Ohio law grants statutory immunity to law enforcement officers in cases alleging wrongful death.[45]

Priah then filed the second complaint and sought additional discovery in advance of any ruling on the motion to dismiss.[46] In response, the Government filed an answer denying the claims of the second complaint,[47] restated its motion to dismiss or for summary judgment in terms of the second complaint,[48] and opposed Priah's request for additional discovery.[49]

The discovery dispute that then arose concerning Priah's request for additional discovery is thoroughly explored in the Court's Order[50] permitting some additional limited review under seal of unredacted documents previously provided to Priah in redacted form, as well as of documents provided under seal only to the Court. However, the Order also denied the rest of Priah's request for additional discovery as to how FBI agents planned the rescue attempt and communicated information in light of FBI policies.

Priah has directly filed a response in opposition to the motion to dismiss or alternatively for summary judgment.[51] In

37. *Id.* at 520.

38. *Id.* at 522.

39. ECF # 18 at ¶ 16.

40. *Id.* at ¶ 17.

41. *Id.* at ¶¶ 38–39.

42. *Id.* at ¶ 41.

43. *Id.* at ¶¶ 48–50.

44. ECF # 14.

45. *Id.*

46. ECF # 19.

47. ECF # 21.

48. ECF # 23.

49. ECF # 25.

50. ECF # 49.

51. ECF # 34.

it, she concedes that Priah alone is the only proper plaintiff in this action, but argues that the other named plaintiffs should nevertheless continue to be recognized as "claimants" under Ohio's wrongful death statute.[52] In addition, she contends that a jury question exists as to whether the United States was grossly negligent or reckless in failing to transmit to the SWAT team the information that Lester would be in the kidnappers' vehicle.[53] Moreover, she maintains that a separate jury question is present as to whether Special Agent Werth was grossly negligent or reckless in firing the shot that killed Lester.[54] Finally, she avers that: (1) a special relationship existed between Lester and the FBI, creating a duty to protect him that was breached here,[55] and (2) no collateral estoppel or *res judicata* exists here concerning the conclusion, expressed, Priah contends, as *dicta* in various court opinions, that Special Agent Werth acted in self-defense.[56]

### III. Analysis

#### A. Standard of review—dismissal for failure to state a claim/lack of jurisdiction

The standard of review for analyzing a motion to dismiss for failure to state a claim made pursuant to Federal Rule of Civil Procedure 12(b)(6) was recently articulated by the Sixth Circuit in *Association of Cleveland Fire Fighters v. City of Cleveland*[57] as follows:

> Whether a district court properly dismisses a suit pursuant to Rule 12(b)(6) is a question of law subject to de novo review. The Supreme Court has recently clarified the law with respect to what

a plaintiff must plead in order to survive a Rule 12(b)(6) motion. The Court stated that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Additionally, the Court emphasized that even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." In so doing, the Court disavowed the oft-quoted Rule 12(b)(6) standard of *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (recognizing "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that a plaintiff could prove no set of facts in support of his claim that would entitle him to relief"), characterizing that rule as one "best forgotten as an incomplete, negative gloss on a accepted pleading standard."[58]

#### B. Claims concerning any alleged deficiencies in planning and communication by the FBI in preparing for or executing the rescue attempt here are precluded by the discretionary function exemption of the FTCA.

##### 1. Standard of review—discretionary function exception

The applicable law concerning the FTCA and the discretionary function exemption were set forth in some detail in the Court's prior Order.[59] That discussion

---

52. *Id.* at 6.

53. *Id.* at 7–8.

54. *Id.* at 8–13.

55. *Id.* at 13–23.

56. *Id.* at 24–28.

57. *Ass'n of Cleveland Fire Fighters v. City of Cleveland,* 502 F.3d 545 (6th Cir.2007).

58. *Id.* at 548 (internal citations omitted).

59. ECF # 49.

will, therefore, only be summarized here.

The FTCA represents a grant of consent by the United States, subject to certain exceptions, to be sued for a tort committed by an employee "in the same manner and to the same extent as a private individual under like circumstances." [60] One of the statutory limitations on this grant is known as the discretionary function exception. That exception provides that if any claim is based on a federal employee's performance or failure to perform "any discretionary function or duty," federal courts will be without jurisdiction to entertain that claim, whether or not there was an abuse of that discretion. [61]

Courts employ a three-step process in evaluating assertions of this exception. [62] First, a court must "identify the conduct that allegedly caused the harm." [63] Next, the court must determine whether that specified conduct "violated a mandatory regulation or policy that allowed no judgment or choice. If so, the discretionary function [exception] does not apply" because the employee was required to comply with the policy directive. [64] Finally, if the challenged action is deemed discretionary, a court must determine whether the "[discretionary] conduct is 'of the kind that the discretionary function was designed to shield.' " [65]

 Because the discretionary function exception "clearly limits the jurisdiction of federal courts," [66] the burden of establishing subject matter jurisdiction by showing that the discretionary function exception does not apply initially falls on the plaintiff. [67] Only after a plaintiff has successfully invoked jurisdiction with a pleading that, on its face, alleges a claim not subject to the exception created by § 2680 does the burden shift to the United States to prove the applicability of § 2680 to the claim presented. [68]

2. *Priah's claims concerning the FBI's planning of Lester's rescue, including the transmission of information to the SWAT team about Lester's location, involve discretionary functions pursuant to § 2680 and so should be dismissed as outside of the jurisdiction of this Court and so failing to state a claim upon which relief may be granted.*

Initially, it is important to restate that, pursuant to this Court's prior Order, [69] Pri-

---

**60.** 28 U.S.C. § 2674.

**61.** 28 U.S.C. § 2680(a); *Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 443 (6th Cir.2005).

**62.** As was discussed in the earlier Order (ECF # 49), published cases frequently characterize the analysis involved as being a two-step process. However, it is clear that the oft-stated two elements of the mandatory analysis rest upon an equally mandatory predicate step. Therefore, that additional required step should be included in formulating the components of the rubric in order that the total analytical framework is stated as a whole.

**63.** *Wood v. United States*, 115 F.Supp.2d 9, 13 (D.Maine, 2000) (quoting *Shansky v. United States*, 164 F.3d 688, 690 (1st Cir.1999));

*Bancheck v. United States*, No. 1:06CV3108, 2007 WL 1683829, at *2 (N.D.Ohio June 8, 2007).

**64.** *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir.1997).

**65.** *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322–23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)).

**66.** *Sharp*, 401 F.3d at 443, n. 1.

**67.** *Bancheck*, 2007 WL 1683829, at *1.

**68.** *Carlyle v. United States, Dep't of the Army*, 674 F.2d 554, 556 (6th Cir.1982).

**69.** ECF # 49.

ah was permitted to fully review under seal all of the relevant unredacted FBI manuals and policies applicable to hostage rescue situations. Based on that review, she now contends: (1) that the FBI violated "dozens" of its written policies by either (a) proceeding with the rescue attempt without knowing for certain where Lester was, or (b) affirmatively misstating to the SWAT team before commencing the operation that Lester would not be in the kidnappers' vehicle;[70] (2) that these policies which were allegedly violated are mandatory, such that an agent has no discretion to fail to account for the correct location of a kidnap victim or to transmit erroneous information;[71] and (3) even if the various policies here are not mandatory and the agents conduct here was discretionary, the discretionary function exception was not intended to shield agents from liability for "forgetting to communicate and/or inquire about the whereabouts of the [kidnap] victim."[72]

The Government, in response,[73] notes that all the relevant documents—the FBI's Manual of Internal Operating Guidelines (MIOG), the SWAT Team Leaders Handbook, and the SWAT Lesson Plan Manual—are not mandatory directives, but, necessarily, are "general checklists and training outlines which do not mandate any course of action but rather set forth elements and general factors to consider in SWAT operations."[74] Specifically, it observes that the frequently cited provisions of these documents by the plaintiffs to the effect that each SWAT team member knows the location of the hostage are not a mandatory directive, but an important factor or element to include, insofar as possible, in plans made or orders given in the midst of a fluid situation.[75] In that regard, the Government also emphasizes that these documents highlight the inherently discretionary nature of any action taken in a hostage rescue attempt, which involves the potentially conflicting interests of (primarily) freeing the hostage and (secondarily) apprehending the kidnappers.[76] It further argues that this discretion in the context of a hostage rescue is sound public policy and thus shielded by the discretionary function exception.[77]

I find the Government's arguments entirely persuasive. I will proceed to examine those arguments within the context of the three-step analysis mandated by the case authority.

As to the initial step—identifying the government action that caused the harm complained of—Priah appears to argue that two actions by the Government caused Lester's death: (1) the failure to communicate/deliberate miscommunication between agents as to Lester's whereabouts during the rescue attempt, and (2) the

---

**70.** ECF # 56 at 2–13. This brief is filed under seal pursuant to a protective order in that it references confidential FBI policies and procedures applicable in responding to hostage and kidnap situations. It will be quoted and/or referenced here with due regard for the sensitive nature of the materials being discussed.

**71.** See, id. at 13–14.

**72.** Id. at 14.

**73.** ECF # 60. Like Priah's brief, the Government's brief here is also filed under seal pursuant to a protective order. It, too, directly references elements of many confidential FBI law enforcement procedures and so will also be here treated circumspectly.

**74.** Id. at 9.

**75.** See, id. at 10.

**76.** Id. at 10–11, citing Flax v. United States, 847 F.Supp. 1183, 1190 (D.N.J.1994).

**77.** Id. at 11.

decision to proceed with the rescue without knowing conclusively where Lester was.[78]

However, as to both actions, the Government makes the persuasive counter argument that the proximate cause of Lester's death was not any communication error by the agents prior to commencing the rescue attempt,[79] nor was Lester's death caused by the decision to proceed with the rescue in the face of incomplete information. Instead, the proximate cause of Lester's death was the subsequent independent decision by Special Agent Werth to fire on the kidnappers' vehicle when he believed it came toward him and endangered the lives of the other agents at the scene.[80] The testimony of record is unrebutted that this decision was made by Special Agent Werth alone and not as the result of any predetermined plan—properly formulated or otherwise—to fire on the kidnappers.[81] Further, as stated by Special Agent Werth also in unrebutted testimony, it was a deci-

sion that would not have been different if he had known Lester was in the vehicle.[82]

Accordingly, I am not convinced that Priah has satisfied the first requirement for a discretionary function analysis to apply here: identifying a governmental action that *caused* the harm complained of. In this case, even if, *arguendo*, Priah is entirely correct that mandatory, non-discretionary FBI policy is that no hostage rescue plan may ever go forward without totally certain knowledge of the hostage's location, Lester was not proximately harmed [83] by a breach of that rule, but as the direct result of Special Agent Werth's independent decision to fire upon the kidnappers' vehicle under the circumstances he described, regardless of whether he had known Lester was inside or not.[84] Nonetheless, I will proceed to examine the next two elements of the discretionary function exception test.

As I noted in the earlier Order [85] concerning the scope of discovery, the "over-

---

**78.** *See,* ECF # 60 at 3, referencing ECF # 56 (Priah's brief) at 2–13.

**79.** The Government also disputes Priah's characterization of the testimony of record that the FBI either failed to inquire as to Lester's whereabouts or knew he would be in the car but deliberately told the SWAT team to the contrary. *See,* ECF # 60 at 4.

**80.** *See, Ervin,* 209 Fed.Appx. at 521. ("Ervin's attempt to run down the FBI agent caused the agent to shoot in self-defense. Darnell Lester died because of Ervin's actions."); *see also, Ervin,* 2006 WL 2507563, at *4 (analyzing Lester's death in light of Ohio law of proximate cause and concluding that Ervin and Waller's conduct in seeking to "avoid apprehension and driv[e] at S.A. Werth" was, together with Special Agent Werth's decision to shoot under those circumstances, the proximate causes of Lester's death). The important fact here is that regardless of whether Special Agent Werth's action was correct or negligent, two courts have concluded that Werth's action, responding to Ervin's decision to flee, was, under Ohio law, the proximate cause of Lester's

death—not any prior decisions or omissions by the FBI in planning or staffing the rescue attempt.

**81.** *See,* ECF # 27 at 5.

**82.** *See,* ECF # 60 at 5.

**83.** Ohio law defines "proximate cause" as "an act or failure to act which, in a natural and continuous sequence, directly produces the injury and without which it could not have occurred." *Brott Mardis & Co. v. Camp,* 147 Ohio App.3d 71, 75–76, 768 N.E.2d 1191, 1194 (Ohio App. 9th Dist.2001) (citing *Jeffers v. Olexo,* 43 Ohio St.3d 140, 143, 539 N.E.2d 614, 617 (1989)).

**84.** *See,* ECF # 27 at 5. "[T]he shooting itself was not caused by the violation of a mandatory directive concerning the kidnapping investigation or the planning of a response ... Plaintiffs have not alleged and cannot prove that a violation of a mandatory directive proximately caused Lester's death."

**85.** ECF # 49.

whelming consensus of federal case law establishes that criminal law enforcement decisions—investigative and prosecutorial alike—are discretionary in nature and, therefore, by Congressional mandate, immune from judicial review." [86]

In this case, as with any hostage/kidnap rescue, the FBI manuals and policies, read in their entirety, attempt to identify all the aspects to be considered by agents to maximize the chances of a successful operation both as to freeing the victim and apprehending the abductors. These potentially incompatible goals inherently require that agents have the discretion to take action best suited to achieving those goals in the context of circumstances that are changing and dangerous. In that regard, the manuals also explicitly acknowledge that in the real world action may need to be taken when, despite best efforts, perfect certainty even as to key objectives is not possible. In short, the individual elements of these manuals cited by Priah do not, and could not, standing alone and with no relationship to other objectives and circumstances, constitute binding, mandatory injunctions on agents.[87]

Deciding whether (1) to wait and seek greater clarity in a dangerous, changeable situation, or (2) to move swiftly, despite not knowing all of what one would plainly wish to know when an opportunity for lifesaving success, perhaps fleeting, presents itself, is the very definition of a discretionary decision and the very essence of many law enforcement actions. It is also the very thing the discretionary function exception was intended to protect from after-the-fact second-guessing when the outcome, as here, is tragically unsuccessful.[88]

Therefore, I recommend finding that the discretionary function exception to the FTCA applies to all the actions taken by the FBI in investigating, planning, and commencing the rescue/arrest efforts directed to Lester and his abductors. Accordingly, I further recommend that if the preceding recommendation is adopted, the Government's motion to dismiss all Priah's claims in that regard for lack of jurisdiction be granted.

## C. The United States is entitled to summary judgment in its favor as to claims that it was grossly negligent in transmitting information concerning Lester's location and/or that Special Agent Werth was grossly negligent or reckless in firing the shot that killed Lester.

### 1. Standard of review—summary judgment

The standard of review applicable to a motion for summary judgment is well-established and well-known.

The Federal Rules of Civil Procedure provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

**86.** *Mesa v. United States,* 837 F.Supp. 1210, 1213 (S.D.Fla.1993).

**87.** *See, Flax,* 847 F.Supp. at 1190. "While the regulations, rules and policies governing the FBI provide broad-based and general guidelines, the very nature of close surveillance suggests that the investigating agent *must* be afforded a significant level of discretion as to how the search will be conducted." (Emphasis added).

**88.** *See, Pooler v. United States,* 787 F.2d 868, 871 (3rd Cir.1986). "[W]hen the sole complaint is addressed, as here, to the quality of the investigation as judged by its outcome, the discretionary function should, and we hold, does apply. Congress did not intend to provide for judicial review of the quality of investigative efforts."

moving party is entitled to judgment as a matter of law." [89] Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact regarding any essential element of the non-moving party's case on which the nonmovant would bear the burden of proof at trial.[90]

In that respect, a fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense.[91] A dispute over a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." [92]

The moving party has the initial burden of proof of showing the absence of a genuine issue of material fact as to an essential element of the nonmovant's case.[93] Once a moving party satisfies this burden, the burden shifts to the nonmoving party to set forth specific facts showing the existence of a genuine issue for trial.[94]

To create a genuine issue of material fact for trial, the nonmoving party must do more than raise some doubt or present merely colorable evidence.[95] Further, it may not simply rely on the allegations of the pleadings.[96] However, the nonmoving party "need not 'produce evidence in a form that would be admissible at trial in order to avoid summary judgment.' Instead, the relevant inquiry is whether the nonmoving party has designated 'specific facts showing there is a genuine issue for trial.' " [97]

The court must evaluate all the evidence presented "in the light most favorable to the party opposing the motion." [98] In evaluating the evidence, however, the court is not permitted to judge that evidence nor to make findings of fact.[99]

In all this, the court must recognize that "summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules of civil procedure as a whole." [100] Essentially, summary judgment is the means by which the moving party may compel the nonmoving party to "put up or shut up" with regard to a critical issue of material fact.[101]

### 2. Standard of review—gross negligence/recklessness

■■■ Liability for any tort, including wrongful death, under the FTCA is determined, by statute, according to the law of

**89.** Fed.R.Civ.P. 56(c).

**90.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**91.** *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984).

**92.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**93.** *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

**94.** *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

**95.** *Id.* at 249–50, 106 S.Ct. 2505.

**96.** *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir.1995).

**97.** *O–So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 505 (6th Cir.1992) (internal citations omitted).

**98.** *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

**99.** *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435–36 (6th Cir.1987).

**100.** *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1034 (6th Cir.1992) (citing *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548).

**101.** *Cox*, 53 F.3d at 149 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989)).

the place where the act or omission giving rise to the claim took place.[102] Moreover, the United States is entitled to assert any defense of immunity available to its employee or to the government, including state law immunities.[103] In addition, Ohio statute specifically grants state law immunity from liability in civil actions for personal injury or wrongful death to federal law enforcement on the same basis as that given to individual employees of Ohio political subdivisions.[104] Ohio law provides immunity in that regard unless the employee of a political subdivision acts in a wanton or reckless manner, or with malicious purpose.[105] In *Ewolski v. City of Brunswick*,[106] the Sixth Circuit, acting pursuant to the FTCA and Ohio law, formulated the standard of review for cases alleging wrongful death by employees of a political subdivision in Ohio:

[A]s employees of a political subdivision [in Ohio], the individual defendants are entitled to statutory immunity unless their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." The standard for recklessness employed by Ohio courts holds that "[t]he actor's conduct is in reckless disregard for the safety of others if ... such risk is substantially greater than that which is necessary to make his conduct negligent." [107]

### 3. Analysis

Priah here again argues initially that FBI agents definitively knew, prior to commencing the rescue attempt, that Lester would be in the kidnappers' vehicle during the rescue but either neglected to tell the SWAT team this crucial fact or inexplicably furnished the SWAT team with directly contrary information. While the Government responds, often persuasively, that the evidence does not prove what Priah contends it proves in this regard, any dispute here is not relevant or actionable for two reasons.

First, as noted, the Government is entitled to immunity from suit as to how it conducted the investigation of Priah's abduction and planned his rescue. Second, as also noted, the proximate cause of Lester's death was the independent decision of Special Agent Werth to fire on the kidnappers' vehicle and not the inevitable consequence of an allegedly deficient plan. Moreover, as Special Agent Werth stated in unrebutted testimony, he would have fired on the kidnappers' vehicle under the circumstances obtaining at that time whether he knew Lester was inside or not. Thus, the critical issue is whether Special Agent Werth's decision to fire is actionable or not.

In that regard, Priah essentially claims that two facts—both which were established during the trials of the kidnappers and neither of which are disputed by the Government—fatally undercut the conclusions reached during the trials that Special Agent Werth acted properly in shooting at the kidnappers' vehicle. Again, it is important to stress that Priah is here contesting the legal conclusions previously drawn from already established, non-disputed facts. She does not offer any new facts nor is she asking the Court to reweigh any previously resolved factual con-

**102.** 28 U.S.C. § 2674 (the United States is liable "in the same manner and to the same extent as a private individual in like circumstances"); *Harris v. United States*, 422 F.3d 322, 326–27 (6th Cir.2005).

**103.** *See, Ewolski v. City of Brunswick*, 287 F.3d 492, 517 (6th Cir.2002).

**104.** Ohio Rev.Code § 9.88.

**105.** Ohio Rev.Code § 2744.03(A)(6).

**106.** *Id.*

**107.** *Id.* at 517 (internal citations omitted).

flict. As such, this is a wholly appropriate matter for summary judgment.

Priah asserts that because: (1) the shots fired by Special Agent Werth struck the kidnappers' vehicle from the side, not the front; and (2) Special Agent Werth could not identify any other agents that were in the path of the kidnappers' vehicle at the time he fired; a jury question exists as to whether Special Agent Werth acted properly or recklessly.[108] I do not find Priah's argument persuasive.

First, even construing all evidence most favorably to Priah, the totality of the evidence developed at the kidnappers' trials shows that Special Agent Werth's actions were objectively reasonable. Utilizing the standard articulated by the Sixth Circuit in *Bing,* which analyzes the totality of the circumstances as they presented themselves to the officer at the scene when the decision to use force was made, Special Agent Werth knew that the crime here was extremely serious, involving violent kidnappers from the drug underworld who were known to have (a) beaten Lester into submission at the commencement of the kidnapping, (b) threatened to kill him if not paid a ransom, and (c) been armed at the time of the rescue. In addition, Special Agent Werth actually saw the Jimmy break containment created by clearly marked law enforcement vehicles by ramming one or more of those occupied vehicles without regard for the safety of their occupants as it, by all accounts, "surged" forward in a sudden—and violent—attempt to resist arrest and flee. Special Agent Werth's testimony is corroborated by all other witnesses that the Jimmy, as it was crashing through the containment barrier of FBI vehicles, did initially directly come at Special Agent Werth just before he was able to step aside as the Jimmy passed. Moreover, there is no factual dispute that there were some 16 SWAT team members at various locations around the rescue scene.

In such circumstances—(1) violent kidnappers, (2) known to be armed, (3) at night, (4) knowing that they were about to be lawfully arrested, (5) driving their SUV directly at occupied, marked containment vehicles of the FBI, (6) in a sudden attempt to escape capture that (7) brought their Jimmy directly on a path toward Special Agent Werth, (8) who was standing in the parking lot not protected in a vehicle and (9) in the vicinity of numerous other agents in the parking lot—it was reasonable for Special Agent Werth, as he managed to move aside to save his own life: (1) not to have turned his attention away from the surging Jimmy bearing down on him to determine precisely where the other agents were; (2) to have concluded that those other agents, known to be at the scene, were likely to be at risk from a vehicle that had just rammed vehicles containing FBI agents and come directly at him; and (3) to have decided that deadly force was required to stop the Jimmy.

While I am fully persuaded that, as a matter of law, the uncontroverted evidence establishes that Special Agent Werth's use of deadly force was objectively reasonable, the Government is not required to meet that test in order to prevail here. Rather, the issue is whether there remains an issue of fact as to whether Special Agent Werth's actions in using deadly force were grossly negligent or reckless.

Even if a jury could conclude that Special Agent Werth should have decided not to fire in the split-second that the Jimmy suddenly passed him by because (1) he was then personally out of danger and (2) he did not know enough about the location of other agents to make an informed judg-

108. ECF # 34 at 8–10.

ment on their risk of danger, that would not make the decision to fire, as a matter of law, reckless or grossly negligent. There is simply no evidence that Special Agent Werth, in making his instantaneous determination about firing on the armed, dangerous felons that had just rammed occupied vehicles in their attempt to escape, displayed such a reckless disregard for the safety of others that any mistake in judgment here was substantially greater than that necessary to make his conduct merely negligent. There is absolutely no evidence proffered by Priah to prove that Special Agent Werth was acting in bad faith or wantonly, without any justifying reason for his action whatsoever.

In sum, I recommend finding that Special Agent Werth's use of deadly force in this instance was, as a matter of law, reasonable. Further, I recommend finding that, at a minimum, Special Agent Werth's conduct could not, as a matter of law, be found reckless or grossly negligent. Accordingly, I recommend that the Government's motion for summary judgment in this regard be granted.

### IV. Conclusion

In sum, for the foregoing reasons, I recommend that the Government's motion to dismiss Priah's claim as to alleged failure by the FBI to follow its procedures and policies in planning, communicating, and executing the rescue attempt be granted for failing to state a claim upon which relief may be granted, and that the Government be granted summary judgment in its favor as to Priah's claim that any individual liability on the part of Special Agent Werth exists for the death of Darnell Lester.

January 25, 2008.

**109.** *See United States v. Walters,* 638 F.2d 947 (6th Cir.1981). *See also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435

**Objections**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order.[109]

(1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).